**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| *EX REL.* **EPHRAIM FUCHS, M.D.** | ) | |
| | ) | |
| **-and-** | ) | **FILED** *IN CAMERA* **AND** |
| | ) | **UNDER SEAL** |
| **EPHRAIM FUCHS, M.D.,** | ) | |
| **c/o Schertler Onorato Mead & Sears** | ) | |
| **555 – 13ᵗʰ Street, N.W., Suite 500 West** | ) | |
| **Washington, D.C. 20004,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 20-3242 (DLF)** |
| | ) | |
| **JOHNS HOPKINS UNIVERSITY** | ) | **JURY TRIAL DEMANDED** |
| **3400 N. Charles Street** | ) | |
| **Baltimore, MD 21218** | ) | |
| | ) | |
| **-and-** | ) | |
| | ) | |
| **CHILDREN'S NATIONAL** | ) | |
| **MEDICAL CENTER** | ) | |
| **111 Michigan Avenue. NW** | ) | |
| **Washington, D.C. 20010** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT

Defendant Johns Hopkins University ("JHU"), with the participation of Defendant Children's National Medical Center ("Children's"), received approval and funding for a National Institutes of Health ("NIH") P01 program project grant, entitled "Bone marrow transplantation in human disease," NCI P01 CA225618 ("the Grant"). Defendants received the grant because they knowingly made false and misleading statements and omissions in their June 5, 2018 application resubmission for the Grant. This lawsuit seeks to recover damages suffered by the United States from the resulting submission of false claims to the United States in connection with the Grant.

Plaintiff Ephraim Fuchs, M.D., by undersigned counsel, acting on behalf of and in the name of the United States of America, brings this civil action under the qui tam provisions of the False Claims Act, and alleges as follows:

## JURISDICTION A N D  VENUE

1.      This is a civil action by Plaintiff Ephraim Fuchs, M.D., acting on behalf of and in the name of the United States, against JHU and Children's under the False Claims Act, 31 U.S.C. 3729-33. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. 1345 and 31 U.S.C. 3732(a).

2.      Defendants transact business in this District and acted together in this District in planning, designing, and conducting clinical research in the District as part of the Grant.  Venue is proper in this District pursuant to 28 U.S.C. 1391© and 31 U.S.C. 3732(a).

## PARTIES

3.      Plaintiff Ephraim Fuchs, M.D., is a Professor of Oncology and Immunology at the Johns Hopkins University School of Medicine. Dr. Fuchs has direct and personal knowledge of false and misleading statements and material omissions made by JHU and Children's in the course of applying to the National Cancer Institute ("NCI"), part of NIH, for the Grant. Dr. Fuchs has provided substantially all material information in his possession related to Defendants' conduct alleged in this lawsuit to representatives of the United States prior to filing suit, and in subsequent disclosures after filing the original Complaint and before filing this Amended Complaint.

4.       Defendant Johns Hopkins University ("JHU") is a Maryland corporation with 501(c)(3) tax status.

5.       Defendant Children's Medical Center ("Children's") is a D.C. corporation with 501(c)(3) tax status.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

6.     In Funding Opportunity Announcement number PAR-18-290 ("the FOA"), NIH/NCI solicited applications for P01 grants to "support integrated, multiproject research programs involving a number of independent investigators who share knowledge and common resources while working towards a unifying overall scientific goal." The FOA required the project grant application to have "at least three related research projects" that "share a common central theme, focus, and/or overall objective."

7.     JHU, with the participation of Children's, submitted an original P01 application on May 25, 2017. That application contained four projects, and four "cores" to provide administrative, biostatistics, immune monitoring, and cell therapy support for the four projects. The four projects related to proposed, additive therapies for cancer patients who were to receive bone marrow transplants ("BMT").

8.     NCI convenes panels of outside subject matter experts to evaluate P01 applications. Typically, three members of the panel take primary responsibility for reviewing and evaluating individual projects in each application. The entire panel then typically meets and considers written reviews and oral statements from the three primary reviewers for each project and assigns an Overall Impact score for each project. The NIH grant application scoring system uses a 9-point rating scale (1 = exceptional; 9 = poor) in whole numbers for Overall Impact and Criterion scores for all applications. NIH expects that scores of 1 or 9 will be used less frequently than the other scores. The panel then votes on an overall impact score for the project as a whole. Project scores range from a best possible score of 10 to a worst possible score of 90.

9.     JHU/Children's initial 2017 application received an overall score of 21 and did not receive funding. The NIH/NCI grant application process allows each applicant to consider the

written evaluations for each project from the primary reviewers, and the overall panel score, and resubmit a failed application to address the reviewers' concerns or criticisms of the initial application.

10.     JHU/Children's resubmitted the Grant application on June 5, 2018, with the same four projects and supporting cores ("the Resubmission"). The Resubmission was 1107 pages long. Dr. Fuchs has submitted the Resubmission to the government.

11.     JHU's Research Integrity Policy states "All members of the University community have an obligation to report good faith suspicions of research misconduct within the scope of this Policy."  Dr. Fuchs complied with that policy by writing a letter to JHU's Research Integrity Officer on June 24, 2020, detailing material false statements and omissions in the Resubmission. Dr. Fuchs' June 24, 2020 letter is attached as Exhibit 1 to this Complaint, and is incorporated by reference.

12.     This Complaint will summarize the Resubmission's material false statements and omissions, and then quote from Dr. Fuchs' more detailed allegations in his June 24, 2020 letter.

## ALLEGATIONS RELATED TO PROJECT 4:

### Misrepresenting Preliminary Study Results:

13.     Project 4, "BMT in solid tumors," had five component clinical studies, although studies 1 and 2, and 4 and 5, were closely related. The third component of Project 4 was a clinical trial entitled "A Pilot Study of Sex-Mismatched Allogeneic Bone Marrow Transplantation for Men with Metastatic Castration-Resistant Prostate Cancer (JHU Protocol J1608; "the Prostate Cancer Study"). The Principal Investigator for the overall grant, Dr. Richard ("Rick") Jones of JHU, was the co-principal investigator for the Prostate Cancer Study.

14.    As background, bone marrow transplantation (BMT) has not been a successful therapy for solid tumor cancers. BMT also presents a substantial risk of graft-versus-host disease ("GVHD"), where transplanted cells of the donor's immune system attack the patient's normal tissues including skin, liver, and gastrointestinal tract. Dr. Jones' application for the third component of Project 4 also did not test the proposed therapy in a pre-clinical mouse model. Accordingly, promising measures of tumor shrinkage and an absence of GVHD in human subjects were important in overcoming reviewer skepticism about using BMT for solid tumors such as prostate cancer.

15.    In simplified terms, the proposed therapy was to transplant female bone marrow into patients with metastatic prostate cancer, and then do a series of testosterone injections months after the BMT. Dr. Jones and his co-investigators hypothesized that the testosterone injections would trigger an immune response from the donated female bone marrow, which would carry over to an immune response to metastatic prostate cancer cells. As a marker for efficacy, the study proposed to measure reductions in prostate specific antigen (PSA). High and increasing levels of PSA are generally recognized as an indication of disease progression in prostate cancer.

16.    Dr. Jones had submitted this study design in earlier grant applications to different agencies but did not receive funding. In 2015, a reviewer evaluating Dr. Jones' grant application to the Department of Defense expressed skepticism about the hypothesis and suggested the therapy "may disturb the homeostatic immune balance, specifically in older patients, and may lead to safety issues."

17.    Dr. Jones included the Prostate Cancer Study in the P01 grant application. The initial reviews rejecting funding for the 2017 initial application expressed serious concerns about the increased risk of GVHD because of the sex-mismatched bone marrow. One reviewer noted

that the proposed therapy had the potential to backfire: "If prostate tumor antigens are not sufficiently augmented and/or if they are, but they do not adequately induce endogenous T cell responses in a timely fashion, the cancers may progress rather than regress . . . ."

18.     By the time of the 2018 Resubmission, Dr. Jones reported that the investigators had tried the therapy on three prostate cancer patients. The Resubmission made two materially false statements about the results of the therapy in those patients. First, the Resubmission said: "3 patients have been enrolled (**first 2 with dramatic decreases in PSA**, 1 just starting) on Protocol J1608." Resubmission at p. 749 (emphasis added). Second, responding to the initial review concern about prostate cancer progressing after transplantation due to the loss of an endogenous immune response, the investigators stated, "We acknowledge, however, that PCa may progress in some men before allogeneic T cell responses develop.  Of note, the **first 2 patients showed dramatic responses to this approach**, but we will continue to carefully monitor this in our first-in-human study . . ." Resubmission, p. 749 (emphasis added)

19.     The Resubmission did not include the underlying patient records, so the reviewers had to accept the investigators' description of a "dramatic response" in the first two patients who received the therapy. The study had pre-determined criteria for determining what percentage of PSA reduction would constitute a favorable response to the therapy. The Resubmission did not inform the reviewers of the truth: neither patient even met the pre-determined criteria for a favorable reduction in PSA.

20.     When Dr. Fuchs wrote emails to Dr. Jones and the principal investigator (PI) asking who had written that the first two patients showed dramatic responses, the PI did not recall writing those words. Dr. Jones denied that he had written those words. As detailed below, Dr. Fuchs has reason to believe that Dr. Jones wrote those words.

**Omitting Results Of Serious Graft-Versus-Host Disease:**

21.     In the course of reviews that rejected funding for the 2017 initial P01 grant application, the first reviewer noted concerns about GVHD in the Prostate Cancer Study: "development of GVHD and TRM [transplant-related mortality] may remain major hurdles for this approach in these patients." Later, the same reviewer commented, "Development of GVHD and risk of TRM are a concern. Benefit of PTCy [post-transplantation cyclophosphamide, a drug used to prevent GVHD] in terms of GVHD prevention is primarily restricted to low incidence of GVHD [chronic GVHD]. Acute GVHD incidence may not necessarily be affected to a similar degree."

22.     Despite the obvious concerns about GVHD in BMTs with sex-mismatched donors in solid tumor patients, the Resubmission omitted material information that the first two patients treated in the Prostate Cancer Study suffered GVHD. Because the reviewers did not receive the underlying patient records, they did not know about the first patient's considerable suffering from GVHD. Dr. Jones saw the first patient on November 2, 2017 and noted "he has chronic GVHD with clear oral and cutaneous involvement . . . ." The first patient suffered agonizing discomfort from GVHD until he died in April 2020. The second patient also suffered from GVHD. The Resubmission simply did not mention that the first two patients suffered from GVHD, while falsely stating that they had "dramatic responses" to the therapy.

23.     Because the first three patients failed to respond to the therapy, JHU physicians treating prostate cancer patients stopped referring patients to it. On March 9, 2020, JHU physician Sam Denmeade, the Principal Investigator on the Prostate Cancer Study, wrote an email suggesting that the study was a failure and would not succeed in recruiting more patients:

Ken, I have read the email train. Been thinking about how to response. We do have only 3 patients and it does not look good for us to recruit more. This idea has just not taken hold with physicians or with patients. Has not helped that none of the first three patients had anything that looked like significant response to the transplant. My sense is we will likely close the trial in the next few months due to lack of feasibility.  Not sure if the word "Progress" applies here.

24.    The JHU principal investigator for the P01 grant, Dr. Rick Jones, responded, minimizing the agony of GVHD in the first patient, arguing that metastatic prostate cancer patients were going to die anyway (so it was appropriate to continue experimenting on them), and citing the economic importance of the P01 grant to JHU:

Whoa, we need to talk, and I'd love to talk to your whole group if we could get everyone together. First off, there was no severe toxicity. Second, the first patient absolutely had a response, no question.  Third, if you take pre-dead patients, they are not going to be cured (short of divine intervention – imatinib doesn't cure blast crisis CML, CAR T cells cure end-stage ALL or lymphoma or probably even early stage for that matter) – the first 3 were to prove to your group we were not going to kill your patients. If we knew your group was only going to consider this if by some act of god it was going to be lazeride, we should never have done this. Cancer treatment is an iterative exercise. Fourth, this was as much an idea of the prostate group – you – as the BMT group. It's not like the crazy transplant docs went off half-cocked and rammed this down your throats. Fifth, I missed the major advance in the last 2 years that has made investigating new treatments in advanced prostate cancer no longer relevant. Finally, and incredibly importantly, this is an investigator-initiated and externally peer-reviewed and funded trial. There are not that many of these in the cancer center, and I suspect at most a handful in prostate cancer. Not only are these the highest profile trials for cancer centers and academic careers, but it looks really bad when they get funding and are closed before they even get fairly tested…

25.    Dr. Fuchs made more specific and detailed allegations about Project 4 in his disclosure to JHU's Integrity Officer, incorporated into this Complaint and quoted below. In order to make this Complaint less bulky, Dr. Fuchs has not attached to this Complaint the documents referenced as attachments or included in the Appendix that he provided to JHU's Integrity Officer, though he can make those documents available to the Court upon request:

Protocol J1608, attached as Appendix G, is a clinical trial of sex-mismatched allogeneic bone marrow transplantation for men with metastatic castration-resistant prostate cancer. The PI of the trial is Sam Denmeade, MD from the urologic oncology group. Richard Jones, MD is the co-PI, and I have been a co-investigator since the trial was first approved on September 28, 2016. The treatment consists of reduced intensity chemotherapy and radiation therapy followed by the infusion of bone marrow collected from a female donor such as the patient's daughter. The patient receives high dose cyclophosphamide, tacrolimus, and mycophenolate mofetil to prevent graft-versus-host disease (GVHD) following transplantation. Patients receive androgen deprivation therapy such as leuprolide to suppress endogenous production of testosterone to the levels obtained by castration. Then, testosterone cypionate is given at approximately 2, 3, and 4 months after transplantation. This "bipolar androgen therapy," or BAT, has anti-tumor activity against castration-resistant, metastatic prostate cancer in the absence of allogeneic bone marrow transplantation. In a phase II study, BAT induced $\geq 50\%$ reduction of prostate-specific antigen (PSA) from pre-treatment baseline in 9 of 30 patients (30%). The investigators hypothesized in the grant application that BAT would also increase expression of male-specific antigens on prostate cancer cells and sensitize the cancer to being killed by female donor T cells reactive to these antigens. They demonstrated that prostate cancer cells express proteins encoded by the Y chromosome as evidence in support of their hypothesis.

The primary objective of the study is to estimate the percentage of men with castrate-resistant, metastatic prostate cancer who achieve complete biochemical PSA response at 6 months after sex-mismatched bone marrow transplantation from a human leukocyte antigen (HLA) partially mismatched donor. Secondary objectives of the protocol include determining the: 1) PSA response rate, defined as the proportion of patients achieving a PSA decline $\geq 50\%$ according to criteria of the Prostate Cancer Working Group, version 2 (PCWG2); and 2) time to PSA progression based on PCWG2 criteria. The PCWG2 defines PSA progression as the date that an increase of 25% or more and absolute increase of 2 ng/mL or more from the nadir are documented. For patients who had an initial PSA decline during treatment, this must be confirmed by a second value 3 or more weeks later.

The clinical trial incorporated a safety stopping rule, specifically that accrual would be halted if the transplant-related mortality at 100 days was convincingly greater than 10%.

According to Dr. Jones, he and Dr. Denmeade applied unsuccessfully for funding for the clinical trial several times before submitting the trial as part of the BMT P01 grant. He did send me a copy of a 2015 grant application to the Prostate Cancer Research Program of the US Department of Defense and the reviews of the application. A reviewer noted

It is suggested that ADT helps in improving immune response; however, such studies are very limited in the CRPC [castration resistant prostate cancer] state of the disease. It is not clear how much and for how long patients with CRPC may respond to ADT and how helpful ADT will be in improving antitumor immune response. The continuous use of PTCy may disturb the homeostatic immune balance, specifically in older patients, and may lead to safety issues.

The trial of allogeneic BMT for prostate cancer was included in Project 4, "BMT for solid tumors," led by Kenneth Cooke and myself.  In addition to the prostate cancer trial, the project included a trial of the drug nivolumab to treat pediatric solid tumors in relapse after allogeneic bone marrow transplantation and a trial of allogeneic bone marrow transplantation for recurrent or metastatic, human papillomavirus (HPV)-associated cancers using donors vaccinated against viral proteins.  Dr. Jones submitted the original P01 application just as the first patient started treatment on the prostate cancer clinical trial.  Though the project was well received overall, the first reviewer noted "development of GVHD and TRM [transplant-related mortality] may remain major hurdles for this approach in these patients."  Later, the same reviewer commented, "Development of GVHD and risk of TRM are a concern. Benefit of PTCy in terms of GVHD prevention is primarily restricted to low incidence of cGVHD. Acute GVHD incidence may not necessarily be affected to a similar degree."  The third review noted

If prostate tumor antigens are not sufficiently augmented and/or if they are, but they do not adequately induce endogenous T cell responses in a timely fashion, the cancers may progress rather than regress (and maybe even to a greater degree after immunosuppressive chemotherapy, as has been anecdotally seen and reported after alloHCT in patient who have been treated for hematolymphoid cancers who have occult other solid tumors).

The first patient treated on trial was a 61 year old man with metastatic, castration-resistant prostate cancer who received bone marrow transplantation from his daughter on May 16, 2017.  He was referred for treatment on the protocol by Dr. Kenneth Pienta of the prostate cancer medical oncology group at Johns Hopkins and was cared for immediately after transplantation by Drs. Jones and Denmeade. The graphic below shows serial values of prostate specific antigen (PSA) in relation to protocol treatments.

-10-



| | 20 | 19 | 18 | 17 | 16 | 15 | 14 | 13 | 12 | 11 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 5/4/2017 1352 | 5/24/2017 0832 | 6/15/2017 0843 | 7/25/2017 1140 | 8/24/2017 1026 | 9/26/2017 1311 | 11/27/2017 0919 | 1/29/2018 1002 | 4/16/2018 1035 | 5/24/2018 1402 | 6/7/2018 0853 |
| **TUMOR MARKERS** | | | | | | | | | | | |
| Prostate Spec Ag-T... | 8.4 * | 8.4 * | 7.7 * | 11.5 * | 17.5 * | 50.3 * | 37.9 * | 43.1 * | 149.3 * | 99.2 * | 70.6 * |

Bone marrow transplant on 5/16/2017

Testosterone cypionate 400 mg intramuscularly

On September 13, 2017 the patient called the cancer center to report a five day history of raised, erythematous rash, "eyes filled with gunk," and a sensation of burning with bowel movements along with dark, tarry stools.  He received his third testosterone injection on September 26, 2017.  Dr. Jones's nurse practitioner, Audra Shedeck, saw him on October 12, 2017.  She noted that

> he comes in noting continued dry eyes and recently saw Opthomology who started Re statis eye gtts. He is having issues with mouth sensitivity to certain foods as well mild oral discomfort and slightly pruritic raised erythematous rash on chest, upper back and arms since mid September. Current symptoms are due to GVHD. He denies having issues with nausea or vomiting or diarrhea but does not burning sensation in rectum with bowel movements.

These symptoms were all consistent with severe chronic graft-versus-host disease.  Dr. Jones saw him on November 2, 2017 and noted "he has chronic GVHD with clear oral and cutaneous invovlement. We restarted Decadron mouth rinses as well as GVHD suppositories."  The patient was treated with sirolimus but this was stopped on January 8, 2018 after he developed oral ulcers and blistering.  On February 26, 2018, oral steroids were started but by March 8, 2018 there was no improvement in his mouth and tacrolimus was added.  On June 6, 2018, dermatologist Dr. Ronald Sweren evaluated the patient for extracorporeal photopheresis (ECP) as treatment for his chronic GVHD.  The patient was admitted to the hospital on December 22, 2018 for treatment of influenza A infection and on February 27, 2019 for treatment of disseminated zoster, a complication of prolonged immunosuppression from chronic GVHD and its treatment with steroids.  ECP for chronic GVHD started on June 7, 2019.  By November or December of 2019 he began to experience shortness of breath, and in March, 2020 he was diagnosed by a pulmonologist as having bronchiolitis obliterans, another devastating manifestation of chronic GVHD.  He was started on steroids and azithromycin.  He was admitted to the University of Maryland Baltimore Washington Medical Center on April 4, 2020 for evaluation of altered mental status and severe hyponatremia.  The next day, he was found pulseless and apneic and could not be resuscitated.



The second patient on protocol was 46 years old at the time of transplantation from a partially HLA-mismatched unrelated female donor for metastatic, castration-resistant prostate cancer.  Drs. Jones and Denmeade also cared for this patient after transplantation.  The graphic below shows the results of serial measurements of PSA in relation to protocol treatments.

The patient presented on January 29, 2018 with "an erythematous rash on anterior trunk as well as back, slightly pruritic."  A skin biopsy was obtained but the result was not diagnostic for acute graft-versus-host disease.  When the rash worsened despite stopping Bactrim, a drug commonly associated with rash, a presumptive diagnosis of GVHD was made and the patient was treated with a steroid taper, which completed on February 19, 2018.  Bone scan on June 20, 2018 showed "no significant change in numerous extensive bony metastases" but CT scan the same day showed "Increasing size of bilateral iliac lymph nodes. For example, right iliac node measures 1.1 cm on axial image 165 series 2, previously 0.8 cm."  The next day he saw Connie Collins, RN, a research nurse who works with Dr. Denmeade.  Her note states, "Dr. Denmeade reviewed the scans and found that there is only a small lymph node that has gotten bigger, but his PSA as increased quite a bit. Due to this the patient will come off study today and will return to clinic in approx one or two weeks to start additional therapy."  He resumed testosterone injections on August 8, 2018 but PSA levels continued to increase.  The patient received additional treatments for his prostate cancer but passed away on November 24, 2019.

The third patient enrolled on study on December 6, 2018 and received a bone marrow transplant from his daughter on December 18, 2018.  Serial PSA values in relation to protocol treatments are shown below.



On April 17, 2019, a technetium whole body bone scan demonstrated new metastatic bone lesions in the inferior angle of left scapula, right sixth and possibly seventh ribs, meeting radiographic criteria for progressive disease.

The BMT P01 application was resubmitted in early June, 2018.  The application makes two references to the outcomes of patients on the prostate cancer trial.  The introduction to the revised project 4 application states that "3 patients have been enrolled (first 2 with dramatic decreases in PSA, 1 just starting) on Protocol J1608."  Responding to the concern about prostate cancer progressing after transplantation due to the loss of an endogenous immune response, the investigators stated, "We acknowledge, however, that PCa may progress in some men before allogeneic T cell responses develop.  Of note, the first 2 patients showed dramatic responses to this approach, but we will continue to carefully monitor this in our first-in-human study . . ."

These claims in the grant are at odds with the clinical outcomes described above.  Neither of the first two patients met PSA criteria for a response.  The first patient met PSA criteria for disease progression on July 25, 2017, just over two months after transplantation, without ever having met the protocol-defined criterion for a PSA response.  The second patient met the protocol-defined criterion for disease progression on February 23, 2018, less than 2 months after bone marrow transplantation.  [Dr. Fuchs now realizes that this statement was technically inaccurate because the patient met criteria for disease progression after eight weeks, while the PCWG2 criteria require that the value showing progression must be at least 12 weeks after the start of therapy.]

Dr. Jones was the only bone marrow transplant physician to see these two patients more than two months after their transplantation procedures.  I first became aware of their clinical courses in March, 2020, when it was time to prepare the first annual progress report on the P01 grant to the NCI.  In a March 6 e-mail to Rick Jones, Sam Denmeade, and me, Ken Cooke wrote "I am working to pull together the updates for project 4. We certainly have updates regarding enrollment to the RIC haploBMT trial for sarcomas. Sam, can you please provide updates on the prostate Ca trial?"  On March 9 at 2:37 pm, Sam Denmeade replied,

> Ken, I have read the email train. Been thinking about how to response. We do have only 3 patients and it does not look good for us to recruit more. This idea has just not taken hold with physicians or with patients. Has not helped that none of the first three patients had anything that looked like significant response to the transplant. My sense is we will likely close the trial in the next few months due to lack of feasibility.  Not sure if the word "Progress" applies here.

-13-

At 2:50 pm, Ken Cooke responded, "Thanks Sam. Understood. This is too bad, we will have to be mindful how we craft any comments for this annual report.  It also underscores the need to get everyone together for PPG [Program Project Grant] meetings soon."  At 2:53 pm, Rick Jones replied,

> Whoa, we need to talk, and I'd love to talk to your whole group if we could get everyone together. First off, there was no severe toxicity. Second, the first patient absolutely had a response, no question.  Third, if you take pre-dead patients, they are not going to be cured (short of divine intervention – imatinib doesn't cure blast crisis CML, CAR T cells cure end-stage ALL or lymphoma or probably even early stage for that matter) – the first 3 were to prove to your group we were not going to kill your patients. If you knew your group was only going to consider this if by some act of god it was going to be lazeride, we should never have done this. Cancer treatment is an iterative exercise. Fourth, this was as much an idea of the prostate group – you – as the BMT group. It's not like the crazy transplant docs went off half-cocked and rammed this down your throats. Fifth, I missed the major advance in the last 2 years that has made investigating new treatments in advanced prostate cancer no longer relevant. Finally, and incredibly importantly, this is an investigator-initiated and externally peer-reviewed and funded trial. There are not that many of these in the cancer center, and I suspect at most a handful in prostate cancer. Not only are these the highest profile trials for cancer centers and academic careers, but it looks really bad when they get funding and are closed before they even get fairly tested…

Two minutes later, responding to Ken Cooke's suggestion of a meeting, Dr. Jones wrote, "Yes, we need to have a P01 meeting soon, but BTW, it's not like this grant went in without prostate cancer's input… I find this unacceptable to be honest – see my prior email for my rant…"

The exchange of e-mails between Sam Denmeade and Rick Jones caused me to be concerned about the accuracy of reporting of outcomes on Project 4.  I became even more alarmed after I had expressed reservations about the potential for patient toxicities on the trial of allogeneic BMT for HPV-associated cancers and Rick Jones responded by excluding me from planning that trial, even though I had designed the trial and generated all the pre-clinical data for it.  I was concerned that he was taking control of that trial to control the reporting of patient outcomes.  In light of my concerns, I reviewed the charts of the patients on the prostate cancer trial to determine their actual outcomes.  My review revealed that no patient met the protocol-defined criterion for PSA response, and the first two patients were

diagnosed with GVHD, which was severe in the first case.  On June 9, I wrote to Rick Jones,

> Our recent disagreements about the safety and efficacy of cellular therapies of cancer for patients where BMT might be an option caused me to review the outcomes of the trial of BMT for prostate cancer using female donors.  You have suggested that my concerns about toxicities for solid tumor patients receiving BMT are the result of a conflict of interest. I have fully disclosed that potential conflict to appropriate authorities at JHU, and have asked you to tell me if there any other steps I should take with respect to that potential conflict. You have not responded.

> I am concerned that the results of the trial of BMT for prostate cancer using female donors do not support the claims in the revised BMT P01 grant application.

> In the review of the original BMT P01 application, the first critique of Project 4 states, "Development of GVHD and risk of TRM are a concern.  Benefit of PTCy in terms of GVHD prevention is primarily restricted to low incidence of cGVHD.  Acute GVHD incidence may not necessarily be affected to a similar degree."  The first two patients treated on the trial developed GVHD, which was severe in the first patient.  In light of the reviewer's concerns, why were these toxicities not reported in the revised application?

> I am particularly concerned about the failure to report the first patient's severe GVHD. The first patient's bone marrow transplant occurred on May 16, 2017. He received testosterone cypionate injections on July 25 and August 24, 2017.  On September 13, 2017 he called the cancer center to report a five day history of raised, erythematous rash, "eyes filled with gunk," and a sensation of burning with bowel movements along with dark, tarry stools.  He received his third testosterone injection on September 26, 2017.  Audra Shedeck saw him on October 12, 2017.  She noted that "he comes in noting continued dry eyes and recently saw Opthomology who started Re statis eye gtts. He is having issues with mouth sensitivity to certain foods as well mild oral discomfort and slightly pruritic raised erythematous rash on chest, upper back and arms since mid September. Current symptoms are due to GVHD. He denies having issues with nausea or vomiting or diarrhea but does not burning sensation in rectum with bowel movements."

These symptoms were all consistent with severe chronic graft-versus-host disease. You saw him on November 2, 2017 and noted "he has chronic GVHD with clear oral and cutaneous invovlement. We restarted Decadron mouth rinses as well as GVHD suppositories." He was treated with sirolimus but this was stopped on January 8, 2018 after he developed oral ulcers and blistering. On February 26, 2018, oral steroids were started but by March 8, 2018 there was no improvement in his mouth and tacrolimus was added. On June 6, 2018 Dr. Ronald Sweren evaluated the patient for extracorporeal photopheresis (ECP) as treatment for his chronic GVHD. He was admitted to the hospital on 12/22/2018 for treatment of influenza A infection and on 2/27/19 for treatment of disseminated zoster, a complication of prolonged immunosuppression from chronic GVHD and its treatment with steroids. ECP for chronic GVHD started on June 7, 2019. By November or December of 2019 he began to experience shortness of breath, and in March, 2020 he was diagnosed by a pulmonologist as having bronchiolitis obliterans, another devastating manifestation of chronic GVHD. He was started on steroids and azithromycin. In April, 2020 he was admitted to the hospital for hyponatremia and altered mental status, and passed away soon after admission.

His clinical picture beginning in September, 2017 is consistent with chronic graft-versus-host disease involving the skin, mouth, lower GI tract, and lung. By March 2018 it was clear that his cGVHD was refractory to steroids. Ibrutinib was approved on August 2, 2017 for the treatment of adults with chronic GVHD after failure of one or more lines of systemic therapy. Dr. Javier Bolaños-Meade is Johns Hopkins's expert on the treatment of GVHD and he runs an outpatient clinic dedicated to patients with this condition. Yet there is no evidence from the patient's hospital record that Dr. Meade was ever consulted, nor is there any evidence that ibrutinib was offered to the patient to treat his chronic GVHD.

Despite this tragic history for the first patient, the introduction to the revised Project 4 application states "3 patients have been enrolled (first 2 with dramatic decreases in PSA, 1 just starting) on Protocol J1608." Did the first two patients meet the protocol-defined criterion for disease response based upon a decline in the PSA value? Did either meet any of the other criteria for disease response as defined by the protocol?"

Rick Jones replied,

although I'm the overall P01 PI, I didn't write Project 4, you and Ken (cc'd) did, and I'm not the PI on the study, Sam Denmeade is. I was the longitudinal doc for the first patient on the study, and I'm happy to discuss the case and treatment of GVHD with you if you like, but I don't think an email is the correct venue. Just briefly without going into details, Javier did know about the patient in question, and advised Audra and me. Moreover, I think the BMT docs in our group should all know how to take care of GVHD. For sure severe GVHD can be tragic, is a known complication of alloBMT that appeared to be induced by the BAT androgen therapy in this case, but importantly is also has an antitumor effect and in fact his PSA appeared to respond to the GVHD. As you well know, patients who relapse after BMT and receive multiple therapies for their relapsed disease are very complicated (he died 3 years after the BMT), and in fact his PFTs were not consistent with BO (GVHD), showing a restrictive pattern, The patient in fact told me a month or so before he died, he was sure he had only survived 3 years because of the transplant.

The second patient on the study was also mine, and never had confirmed GVHD and if it was, was inconsequential (the type you have been on a paper suggesting is associated with improved survival after transplant without toxicity.) He had a skin rash and no other signs of GVHD after 5 months after transplant. Skin biopsy was not consistent with GVHD, but we treated with short course of non-GVHD dose steroids because of pruritis, and also stopped his Bactrim. The rash resolved immediately and never returned. He died 2.5 years after BMT of disease progression. You can talk to Sam who is both the patient's doc and the study PI, but I think the third person on the trial is 1.5 years out, doing well and in fact showing a response.

The next day I replied,

Rick— Your response raises more questions:

1.    I did not write that "3 patients have been enrolled (first 2 with dramatic decreases in PSA, 1 just starting) on Protocol J1608." Did you write it?
2.    If you did not write it, who did?
3.    Do you agree that the statement was false?

-17-

4.      Did both of the first two patients meet the protocol-defined criterion for a tumor response based upon PSA values, or based upon any other criterion?

5.      Given the concerns about GVHD in the review of the original grant application, why didn't you report that GVHD had occurred in one or both of the first two patients?

6.      Why didn't you document your conversations with Javier about the first patient in his chart?

Dr. Jones replied,

> I have no interest in continuing this by email. I didn't write it, but for sure you did or at least approved it as co-PI of project. The first person had a PSA response. I don't even know that we had data on the second patient when the grant went in, and to be honest I don't know if the second patient had a PSA response because I was not his prostate cancer doc or PI on the protocol. Sam just told me the third person has had a PSA response, but again, I haven't checked that out either. Speaking of which, why are you not including the protocol PI on your protocol/grant questions.
>
> As far my care of GVHD, which I think was state-of-the-art, have you never been to a Hopkins compliance seminar about having these discussions in emails. If you want to come talk to me, I'm happy to discuss further since it appears you've taken a keen interest in the care of our GVHD patients. I'm sure Javier would even consider making you a full-time member of the GVHD team with your new found interest, and it would certainly help with your RVUs.

Later that day, he wrote

> Just to put your mind at ease, again because I'm sure you have only the best intentions here, I actually looked at the second patient's PSA after BMT, which BTW you could have done as well. And in fact, it did respond – see below. I suspect that when your wrote Project 4, you actually looked at the data before you submitted it, saw that it had dropped 50%, agreed with Sam who probably wrote that as Protocol PI, and just forgot that you did the right thing…BTW, day 0 was 12/28/2017. I feel much better that you did your job and made sure the data being presented at the time was in fact correct. As the PI of the grant, you might say that I should have checked it as well, but it's hard to check every piece of data in a large multi-project grant, and I have to trust my colleagues. As you can see, my trust was well-founded. You should also feel good that although your memory may have failed your oversight of the data at

-18-

the time of submission (May 2018), you actually apparently did your job as Project leader…

Results for REDACTED as of 6/10/2020 09:12

| | Ref. Range | 12/14/2017 14:00 | 12/18/2017 13:44 | 2/23/2018 10:27 | 3/26/2018 11:13 | 4/24/2018 12:04 | 6/20/2018 14:44 | 8/2/2018 14:28 | 9/6/2018 11:41 | 10/4/2018 09:27 | 10/11/2018 12:27 | 11/29/2018 06:47 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Prostate Spec Ag-TOSOH | Latest Ref Range: 0.0 - 4.0 ng/mL | 292.1 (H) | 276.4 (H) | 483.5 (H) | 337.1 (H) | 158.8 (H) | 246.7 (H) | 568.1 (H) | 731.8 (H) | 954.3 (H) | 1,218.2 (H) | 1,597.7 (H) |

The next day I e-mailed Sam Denmeade, copying Rick Jones and Ken Cooke:

Sam,

Please see the e-mail correspondence below.  Rick is suggesting that you wrote the sentence in the revised BMT P01 grant application of June, 2018 that "3 patients have been enrolled (first 2 with dramatic decreases in PSA, 1 just starting) on Protocol J1608." That would appear to contradict your e-mailed statement on March 9 of this year that "We do have only 3 patients and it does not look good for us to recruit more. This idea has just not taken hold with physicians or with patients. Has not helped that none of the first three patients had anything that looked like significant response to the transplant." Did you write the statement in the grant application shown above?  Do you agree that the first two patients treated on the protocol had dramatic decreases in their PSA?

Dr. Denmeade responded: "I don't recall writing that statement, but there are many things I don't recall.  Two patients did have declines in PSA, but I wouldn't classify them as dramatic."

Dr. Denmeade's response is consistent with the content of e-mails leading up to submission of the revised application in June, 2018.  On May 18, 2018 he provided requested revisions to the introduction and body of Project 4.  His revisions, attached as Appendix H, do not include the statement that the first two patients had dramatic PSA responses, and I did not receive any further revisions from him.  On June 1, 2018, Rick Jones sent the entire grant package by e-mail to all the grant investigators.  I cannot open that attachment because the file I have is corrupted.   On June 3, Ken Cooke replied by providing revisions to the grant package; his e-mail and relevant revisions are provided as Appendix J.  The claims that "3 patients have been enrolled (first 2 with dramatic decreases in PSA, 1 just starting) on Protocol J1608" and that "the first 2 patients showed dramatic responses to this approach" now appear in the introduction to the revised project 4 application.  Dr. Cooke also notes a discrepancy between the introduction, which

states that 3 patients have been enrolled, and the enrollment report stating only two patients have been enrolled.  Since Dr. Cooke is not an investigator on the prostate cancer trial, I suspect that Rick Jones added the statements about dramatic decreases in PSA and dramatic responses.  A search of the text of the submitted grant for the word "dramatic" yielded three other uses of the phrase "dramatic responses," all contained in Project 1 co-authored by Drs. Jones and William Matsui.

A second and independent concern relates to the failure to report on the occurrence of graft-versus-host disease despite the concerns of the reviewers of the original grant application.  GVHD has always been a major if not primary objection to applying allogeneic BMT to treat solid tumors.  The reviewers of the Department of Defense application as well as of the original BMT P01 application expressed concerns about toxicities including GVHD.  Dr. Jones took care of the first two patients during their GVHD episodes but failed to mention it to the other authors of the revised Project 4 application.  A reviewer of the revised application continued to express concerns about GVHD:

> While the bipolar androgen deprivation therapy (BAT) may up-regulate HY targets on many normal tissues, as well as prostate cancer cells, data that the approach described does not increase expression of the same target antigens on normal tissues, such as lung, GI tract, and skin that could be at risk for an enhanced GVH effect are missing.

The first patient was already suffering severe oral, ocular, dermatologic, and gastrointestinal complications of GVHD by the time the revised grant application was submitted, yet Dr. Jones did not mention these complications.  It certainly may have affected the scoring of the application had the reviewer known that his or her concerns about the potential for testosterone to augment GVHD had been validated.  Further, Dr. Jones downplayed this complication to his colleagues by claiming in an e-mail that "there was no severe toxicity."  He failed to obtain or at least to document appropriate consultations and failed to offer the first patient the only FDA-approved therapy of steroid-refractory, chronic graft-versus-host disease.

In summary, Project 4 of the revised BMT Program Project grant application contains false claims of the anti-tumor efficacy of allogeneic bone marrow transplantation for prostate cancer using female donors.  The application claims that the first two patients showed "dramatic responses to this approach" with "dramatic decreases in PSA," but the actual PSA values show that the first patient met the criterion for PSA progression within 2.5 months after transplantation and the second patient met the criterion within 2 months after transplantation. [Dr. Fuchs now realizes that the second patient did not meet the criteria for disease progression (see above).] Despite the repeated concerns about GVHD expressed by reviewers, Dr. Jones failed to notify the reviewers about the development of severe, steroid-refractory GVHD in the first patient, downplayed its severity to his colleagues, and

failed to document appropriate consultations or offer proven effective therapy to the patient.

### JHU HAS NOT EXECUTED WHAT IT PROMISED IN PROJECT 4

**Trial 2 Has Stalled And Bristol Myers Squibb Withdrew Its Financial Support:**

26.     Trials 1 and 2 in Project 4 are related. Trial 1 treats high risk solid tumors with BMT: "A Phase II trial of reduced intensity conditioning and partially HLA-mismatched (HLA-haploidentical) related donor bone marrow transplantation for high-risk solid tumors (Johns Hopkins protocol # J12106)." Under certain conditions, Trial 1 patients are eligible to enroll in Trial 2 after BMT, where they receive bi-weekly doses of Nivolumab, an expensive antibody therapy manufactured by Bristol Myers Squibb ("BMS").

27.     Trial 1 began in 2013. It had enrolled roughly three-four patients a year through 2018. Trial 1 had no pre-clinical data in mouse models to suggest that BMT would be effective in the solid tumors at issue, and the results of Trial 1 were consistent with the poor outcomes for BMT in treating advanced solid tumors. The initial 2017 P01 Grant application did not include Trial 1 in its list of Grant trials, and did not request funding for Trial 1. The initial 2017 Grant application included Trial 2, and requested funding for it.

28.     Just before JHU submitted the revised 2018 Grant application, JHU's School of Medicine entered into a sponsored research agreement with BMS where BMS would provide support for Trial 2 (J17124), to test Nivolumab in eligible patients from Trial 1.  According to the agreement, BMS would provide, at no cost to JHU, the necessary quantity of Nivolumab and funding for various study expenses at a total cost not to exceed $1,568,793.31. J H U  i n c l u d e d a  copy of the itemized budget from the clinical trial agreement with BMS on pages 923- 925 of the revised grant application (summarized below):

| Item | Cost/time point | Time points/subject | Cost/subject | # subjects | Total cost |
|---|---|---|---|---|---|
| Labs: ACTH, Free T4, TSH | $320.00 | 11 | $3,520.00 | 39 | $137,280.00 |
| HIV, hepatitis testing | $193.00 | 1 | $193.00 | 39 | $7,527.00 |
| Blood for circulating tumor cell assays | $41.00 | 15 | $615.00 | 39 | $23,985.00 |
| Blood for immunophenotyping | $41.00 | 15 | $615.00 | 39 | $23,985.00 |
| Specimen collection, processing, handling, and shipping | $85.00 | 15 | $1,275.00 | 39 | $49,725.00 |
| RECIST read | $300.00 | 11 | $3,300.00 | 39 | $128,700.00 |
| Pharmacy | $219.00 | 12 | $2,628.00 | 39 | $102,492.00 |
| Personnel (PI, co-PIs, research nurse, study coordinator, regulatory, lab tech, research manager | | | $13,421.37 | 39 | $523,433.54 |
| Total direct costs | | | $25,567.37 | | $997,127.54 |
| Indirect cost rate | 34% | | | | |
| Oncology surcharge | 5% | | | | |
| Total indirect costs | 39% | | | | |
| Total costs | | | $35,538.65 | | $1,386,007.28 |
| Per patient reimbursement if study not completed (90% of total) | | | $31,984.78 | | |
| Non-refundable startup fee | | | | | $33,440.76 |
| Invoiceable costs | | | | | $149,345.27 |
| Maximum allowable costs | | | | | $1,568,793.31 |

29.     The budget for BMS's support of Trial 2 included paying for RECIST reads for 39 additional patients projected to enroll in Trial 1, 30-33 of whom would be expected to move on to Trial 2. Trial 1's protocol contained an objective "to compare FDG PET-based qualitative and quantitative tumor response assessment with standard computed tomography (CT) based RECIST criteria." RECIST stands for Response Evaluation Criteria in Solid Tumors and requires a radiologist to measure the longest axis of the five largest tumors on CT scan and compare the sum of these axes to the sums of the longest axes of the corresponding tumors on the previous CT scan. Trial 1's protocol required RECIST reads before BMT and 30, 90, 180, 270, and 365 days after transplantation.

30.     The revised 2018 Grant application included Trial 1 within the Grant, and listed the RECIST/PET comparisons as secondary endpoints. Page 818 of the revised grant application

mentioned that secondary endpoints of Trial 1 included "Comparison of FDG PET-based qualitative and quantitative tumor response assessment with standard CT immune RECIST criteria and irRECIST [immune-related RECIST]".  Page 837 of the revised grant application listed a secondary endpoint of Trial 2 "To determine the response rate to Nivolumab given after haploBMT to recipients with relapsed or progressive ultra-high risk sarcomas (part A) and the immune-related progression free survival (irPFS) 1 rate at 6 months after Nivolumab when given pre-emptively (part B)."  Determination of irPFS requires measuring response by irRECIST, a variation of RECIST.

31.     The 2018 revised Grant application proposed two phases for Trial 2. Part A would provide Nivolumab to patients whose cancer relapsed after BMT. The 2018 application proposed to begin testing Nivolumab for safety in six to nine relapsed patients in Part A. If treatment of the first six to nine patients demonstrated safety, the 2018 application proposed that Part A would continue to recruit relapsed patients with Nivolumab, and Part B would provide Nivolumab pre-emptively to patients who had not relapsed after BMT.

32.     JHU's revised 2018 Grant application projected enrollment of the first six to nine patients in Part A by the end of 2020, and enrollment of 24 patients in Part B by the end of 2023 (page 827).

33.     Upon information and belief, BMS' willingness to provide free drug and fund research expenses for Trials 1 and 2, and JHU's projections for active study accrual, were material to NCI's consideration of the revised 2018 Grant application.

34.     After NCI approved the Grant, accrual in Trial 2 fell below JHU's projections. The table below summarizes accrual and results for Trial 2:

| Patient # | Part | (Trial 1 patient #) | Date of enrollment | # nivolumab doses received | Date of disease progression | Date of death |
|---|---|---|---|---|---|---|
| 1 | A | 19 | 1/23/2019 | 3 | 2/21/2019 | 3/7/2020 |
| 2 | A | 16 | 5/9/2019 | 79 | - | - |
| 3 | A | 22 | 7/31/2019 | 2 | 8/20/2019 | 9/3/2019 |
| 4 | B | 24 | 8/6/2020 | 8 | 11/24/2020 | - |
| 5 | B | 25 | 8/27/2020 | 5 | 11/11/2020 | - |

35.    In approximately mid-November 2019, and no later than January 31, 2020, BMS notified JHU that it would no longer provide free drug or financial support for new enrollees in Trial 2. Upon information and belief, BMS' decision to end funding for Trial 2 reflected a judgment that the odds of trial success were not high enough to justify BMS' continuing financial support.

36.    On January 31, 2020, JHU's study team for Trial 2 provided an update to the Clinical Research Office of JHU's Weinberg Cancer Center as part of an annual scientific review for the trial. They stated "At this time the study Supporter [BMS] is allowing current patients to remain on study, however, they have indicated they will not be able to provide study support moving forward. The PI [Principal Investigator] is currently engaged with the Supporter and exploring additional potential funding options."

37.    The Grant investigators submitted an annual progress report to the NCI sometime in March or April 2020.  That report did not disclose BMS' decision to stop supporting Trials 1 and 2. BMS' decision to withdraw support for Trials 1 and 2 signaled a lack of confidence in the trial's prospects for success and suggested that, without additional funding from alternate sources, JHU would not be able to complete the trial as promised in the Grant application. Upon information and belief, BMS' withdrawal of support would thus have been material to NCI's decision to continue funding the Grant.

**JHU Terminated Trial 3 On June 16, 2021, After The Only Three Study Patients
Had No Response And JHU Oncologists Refused To Refer Additional Patients**.

38.     As described above, the 2018 revised Grant application falsely reported that the

first two of three patients enrolled in Trial 3 had "dramatic responses" to the experimental therapy

of treating male prostate cancer patients with BMT from female donors. In fact, none of the three

patients had a positive response, and the Grant application did not disclose that two patients

developed graft-versus-host disease.

39.     The first patient on the study died on April 5, 2020 with severe chronic graft-versus-

host disease. On April 3, 2020 he received an injection of testosterone cypionate in the outpatient

clinic at Johns Hopkins, even though he had been removed from the clinical trial in May 2018 for

disease progression and testosterone cypionate is contraindicated in patients with prostate cancer

outside of a clinical trial.  He was admitted to an outside hospital the next day with delirium and

severely low blood sodium level. A CT scan of the head did not show metastatic cancer or any

other abnormality. The hospital record stated: "at 2225 on the evening of 4/5/2020 it was noted on

the cardiac monitor that the patient became bradycardic and then asystolic. Code blue was initiated

and CPR was started. Unfortunately, the patient did not respond to resuscitation measures and was

pronounced at 2240." Cause of death was listed as "hypercarbic respiratory failure." There is no

evidence in the record to indicate that the patient died from prostate cancer.

40.     When oncologists refused to refer additional patients to trial 3, JHU terminated the

trial. Dr. Denmeade summarized Trial 3's results in his termination report:

> A total of 3 patients were enrolled to the study. No patient exhibited sustained response to
> the bone marrow transplant. Two of the three patients have died from prostate cancer. One
> patient remains alive with progressive disease treated with subsequent hormonal and
> chemotherapy.
>
> Based on the complexity of the treatment and lack of established efficacy, it has proven
> difficult to accrue additional patients to the trial. There are many standard treatments for

prostate cancer that are effective and less toxic. Therefore, we have concluded that further accrual to this trial is not feasible and have opted to close the trial.

**JHU Refused Dr. Fuchs' Recommendation to Redesign Trials 4 and 5 Consistent with Favorable Pre-clinical Data, Refused Dr. Fuchs' Request To Conduct Pre-Clinical Trials Before Subjecting Patients To Experimental Therapy, Redirected Funding For The Trials, Removed Dr. Fuchs As An Investigator, And Does Not Have Laboratory Equipment Necessary To Perform Trials 4 And 5, Which Have Yet To Begin.**

41.     Dr. Fuchs advocated and designed related Trials 4 and 5 in Project 4 of the Grant to test the hypothesis that BMT could be effective against advanced human papillomavirus ("HPV") associated oropharyngeal cancer if the BMT donors were first vaccinated against the E7 antigen of HPV strain 16 (HPV16).  The hypothesis was that vaccinating the donors against E7 of HPV16 would make the donated cells more active against HPV16-associated oropharyngeal cancer. Dr. Fuchs conducted pre-clinical studies in mice demonstrating that vaccinating the donor against the E7 antigen of HPV16 made the donor's immune cells more active against HPV16-associated tumors.

42.     When human bone marrow transplants began in the 1960s, the procedures required strict tissue matching between donors and recipients, because imperfect matches triggered lethal graft-versus-host disease ("GVHD"). Dr. Fuchs led studies demonstrating that giving BMT recipients cyclophosphamide, a drug that suppresses immune responses, early after transplantation ("post-transplantation cyclophosphamide" or "PTCy") would allow BMT donations from imperfectly matched donors, revolutionizing the availability of BMT.

43.     Understanding that PTCy would be necessary to make the proposed BMT treatment for HPV16-asociated cancers widely available, Dr. Fuchs conducted pre-clinical studies in mice where the recipient mice received PTCy. Those studies showed that the PTCy essentially eliminated the vaccination benefits. However, Dr. Fuchs theorized that the anti-tumor benefit of donor vaccination could be restored without causing lethal GVHD by infusing donor lymphocytes

depleted of CD8-positive cells after PTCy. Dr. Fuchs conducted pre-clinical mice studies showing that the CD8-depleted injections, administered the day after PTCy, provided a therapeutic benefit against HPV16-associated cancers.

44.    Trial 4 proposed to test the safety of vaccinating healthy donors against HPV.  Trial 5 proposed to use vaccinated donors to provide bone marrow transplants to recipients suffering from HPV related oropharyngeal cancers. JHU's Grant leadership were concerned that the CD8-depleted injections would be too expensive. Although the revised 2018 Grant application included Dr. Fuchs' pre-clinical study data, JHU proposed to do Trial 5 without the CD8-deplated injections. NCI approved funding for Trials 4 and 5 on that basis.

45.    The 2018 Grant application projected that Trial 5 would begin in the second half of year 1, roughly October or November 2019, and would complete accrual of 20 donors and 20 recipients by the middle of year 4, approximately October 2022.

46.    In planning for Trial 5, Inovio Pharmaceuticals had promised to donate its HPV vaccine to support the study. Shortly after NCI funded the grant, Inovio withdrew its support for the trial.

47.    In September 2019, Dr. Fuchs identified PapiVax Biotech as a potential donor of a similar HPV vaccine. In conjunction with seeking PapiVax's support, Dr. Fuchs asked Dr. Jones to revise the protocol for Trial 5. Dr. Fuchs proposed to inject healthy donors with PapiVax's HPV vaccine and give patients cyclophosphamide followed by CD8-depleted lymphocytes from the vaccinated donors. Dr. Jones initially went along with this proposal. Dr. Fuchs and collaborators secured PapiVax as a vaccine source, wrote the clinical protocols for both donor vaccination and recipient cell therapy, and received FDA approval to move forward with the donor vaccination trial.  Dr. Fuchs sought financial support for including the CD8-depleted injections from Miltenyi

Biotec, a company that manufactures the devices necessary to deplete CD8-positive cells from donor lymphocytes, and was interested in developing cell-separation technologies and therapeutics.

48.     However, Dr. Jones and Grant leadership withdrew their support for the revised protocol. They proposed a randomized, two-armed study design where half the patients would receive BMT from vaccinated donors and, if the cancer relapsed, CD8-depleted vaccinated donor lymphocytes 90 or more days after transplantation. Grant leadership proposed that the other half of study patients would receive cyclophosphamide and CD8-depleted lymphocytes from vaccinated donors.

49.     Dr. Fuchs protested this design for lack of pre-clinical data justifying the BMT arm. Dr. Fuchs also believed that Miltenyi Biotec would not provide financial support for the two-armed approach. Dr. Fuchs recommended that JHU conduct pre-clinical studies to test whether providing CD8-depleted lymphocytes from vaccinated donors several weeks after transplantation would have any therapeutic benefit.

50.     JHU Grant leadership refused to conduct the pre-clinical studies Dr. Fuchs recommended, removed funding of a post-doctoral fellow for Dr. Fuchs' laboratory, and removed Dr. Fuchs as an investigator on Trials 4 and 5. The Grant application stated that Dr. Fuchs would commit 10% of his total work effort to the Grant to conduct laboratory studies and lead Trials 4 and 5. Grant leadership's decision to remove Dr. Fuchs as an investigator on Trials 4 and 5 obviously reduced the amount of Dr. Fuchs' work effort on the Grant. When Dr. Fuchs refused to certify that his work effort on the Grant remained at 10%, Grant leadership removed him from the Grant altogether.

51.     JHU Grant leadership transferred funding from Trials 4 and 5 to provide a research

nurse and study coordinator to support Trial 1 and to fund RECIST reads for Trials 1 and 2. Transferring these funds added to budgetary problems for Trials 4 and 5.

52.      Grant leadership's revision of Trial 5's protocol completely stalled progress on Trials 4 and 5. JHU's IRB did not approve the revised protocol for Trial 5 until March 2022.

53.      Expensive cell separation devices are necessary to remove CD8-positive cells from donor blood collections. JHU owns Miltenyi Biotec cell separation devices, but JHU has not paid required fees to maintain the devices. JHU's cell separation devices will be outdated as of January 1, 2023, when Miltenyi Biotec will cease supporting and maintaining them. JHU needs to purchase new cell separation devices to conduct Trial 5, but in the past has not allocated funds to do so. JHU does not currently have actively maintained cell separation devices necessary to conduct Trial 5.

54.      JHU has transferred funding away from Trials 4 and 5, has not committed funds necessary to conduct those trials, and does not have actively maintained cell separation devices necessary to conduct Trial 5. Trials 4 and 5 have not accrued any patients to date.

## SUMMARY OF PROGRESS ON PROJECT 4

55.      Project 4 and Core C of NCI grant # P01 CA225618 received $268,000 per year from May 2019 through April 2022 to conduct 5 clinical trials related to bone marrow transplantation for solid tumors and associated laboratory studies. The table below shows that these trials were projected to enroll nearly 100 patients in the first three years but enrolled only 12 patients.

| Trial # | Title | Projected total accrual | Projected annual accrual | Actual accrual | | |
|---|---|---|---|---|---|---|
| | | | | Year 1 | Year 2 | Year 3 |
| 1 | BMT for pediatric solid tumors | 39 | 11 | 4 | 3 | 1 |
| 2 | Nivolumab after pediatric BMT | 30-33 | 7-8 | 2 | 2 | 0 |
| 3 | BMT for prostate cancer | 20 | 6.7 | 0 | 0 | 0 |
| 4 | Donor vaccination against HPV E7 | 20 | 4 | 0 | 0 | 0 |
| 5 | Donor cell therapy of HPV+ cancer | 20 | 4 | 0 | 0 | 0 |
| | Totals: | 129-132 | ~33 | 6 | 5 | 1 |

Two clinical trials related to bone marrow transplantation for human papillomavirus-associated cancers have not started and may never enroll a patient for lack of a required cell separation device. A trial of BMT for prostate cancer failed to enroll a single patient during the grant period and was terminated by the PI on June 16, 2021. The trial of nivolumab after BMT for pediatric solid tumors lost a supply of free drug and financial support from its industry sponsor less than eight months after initiation of the Grant and has not enrolled a patient since August 14, 2020. Grant leadership has diverted funds from Trials 4 and 5 to pay for personnel and research studies not approved prospectively by the NCI. The total inactivity of trials 2-5 since August 2020 raises questions as to how Grant funds for these trials and correlative lab studies in Project 4 and Core C are being spent.

56.     Because JHU removed Dr. Fuchs from the Grant, he does not have access to JHU's progress reports to NCI. Upon information and belief, if JHU had fully disclosed the false representations in the revised 2018 Grant application and the reasons for the lack of progress on Project 4 described above, NCI would not have continued funding the Grant.

## ALLEGATIONS RELATED TO PROJECT 3:

### Misrepresentation Of Study Design:

57.     Project 3, "Antigen-specific T cells" contained two component studies. One of those two component studies is a clinical trial entitled, "Prospective phase I Research of Expanded multi-antigen Specifically Oriented Lymphocytes for the treatment of Very high risk Hematopoietic Malignancies." The study proposed to test a new therapy for high risk patients with Acute Myeloid Leukemia (AML) or Myelodysplastic Syndromes (MDS). The study proposed to enroll patients at both JHU and Children's. Standard therapies for AML and MDS patients include bone marrow transplants, which frequently achieve only temporary remission. Many patients

relapse. Life expectancy after BMT remains tragically short for high risk patients. Arm C of the study proposed to inject patients with T-cells from donors within 44 days of BMT in the hopes that the donor T-cells would trigger immune responses to delay or prevent relapse. To evaluate whether the therapy had promise, the Resubmission proposed to compare relapse and death rates for patients who received the proposed therapy to high risk patients who did not. Resubmission at pp. 607, 625.

58.     In fact, by the time of the resubmission, and during the course of the trial leading up to an annual progress report submitted in March-April 2020, the investigators enrolled patients in Arm C only after their disease had not relapsed for months after their transplants. This enrollment delay culled patients with early events such as death or relapse and so created a favorable cohort of patients who were already event-free for months before enrolling on the trial and receiving treatment. Comparing event-free survival in this highly selected, favorable cohort to event-free survival in all transplanted patients is clinically meaningless; there are no data available analyzing event-free survival of patients enrolled onto a clinical trial at variable times after transplantation.  It is highly likely that the reviewers would have downgraded Project 3 had they known that Arm C of the trial would produce only this meaningless comparison.

**Misrepresenting preliminary study results:**

59.     Arm A of the same component of Project 3, "Prospective phase I Research of Expanded multi-antigen Specifically Oriented Lymphocytes for the treatment of Very high risk Hematopoietic Malignancies," proposed to test the safety of increasing doses of the post-BMT T-cell injections. By the time of the Resubmission, JHU and Children's had already begun administering the post-BMT T-cell therapy to patients. In the course of describing preliminary results for those patients in the Arm A safety study, the Resubmission misrepresented preliminary

efficacy results for the T-cell therapy. The Resubmission falsely claimed that the T-cell therapy "**induced CR [complete remission] in 87.5% relapsed patients** post BMT which is unprecedented for any cell therapeutic in AML" Resubmission at p. 599 (emphasis in original). The Resubmission also claimed "14 patients (8 patients from JHU) (age range 9-70 years; for Hodgkin's lymphoma (n=2), B cell ALL (n=2), or AML/MDS (n=8) received TAA-L for relapsed disease 2-12 months after BMT. . . . Responses of evaluable patients (n=12) are: progressive disease (n=2), stable disease (n=2), CR (n=8) and PR (n=1) with **7/8 AML patients achieving CR/PR.**" Resubmission, p. 604 (emphasis in original).

60.     Dr. Fuchs has access to the medical records of the first eight patients treated at JHU and of the second and third AML patients treated at Children's, both of whom were referred from JHU by Dr. Jones. He does not have access to the records for the other patients treated at Children's. Dr. Fuchs reviewed outcomes of the first eight AML patients treated in Arm A, two from direct examination of patient records and for all eight as reported by the investigators in annual reports to the FDA and to the NIH. The outcomes in the annual reports are consistent with each other and with the patient records. Three had progressive disease after the infusion and one had a partial response with a decline in blasts from 0.01% to 0.005%. The remaining four were in remission at the time of infusion and remained in remission for 6 months, 17 months, >3 years, and 4 months, respectively. **None of the eight AML patients went from having disease detectable by flow cytometry just before infusion to having no AML by flow cytometry at the first measurement after infusion.** In other words, the Resubmission said that the therapy had induced remission in 7 of 8 patients, an unprecedented result, when in fact the therapy had not induced complete remission in a single patient who had measurable disease before receiving the therapy.

61.     Dr. Jones confirmed in emails to Dr. Fuchs that the Resubmission had inaccurately reported efficacy results for Arm A. Dr. Jones blamed a junior researcher at Children's, Kirsten Williams, the original Principal Investigator, for the inaccuracies, but the facts and circumstances indicate that Dr. Jones and Dr. Bollard, co-leader of Project 3 and sponsor of the therapy's Investigational New Drug application to the US Food and Drug Administration, were at a minimum reckless in reporting the admittedly inaccurate data.

62.     Dr. Fuchs made more specific and detailed allegations about Project 3 in his disclosure to JHU's Integrity Officer, incorporated in this Complaint and quoted below. Dr. Fuchs' references to CNMC are to Children's National Medical Center ("Children's"). In order to make this Complaint less bulky, Dr. Fuchs has not attached to this Complaint the documents referenced as attachments or included in the Appendix that he provided to JHU's Integrity Officer, though he can make those documents available to the Court upon request:

> Project 3, led by Dr. Bollard and Richard Ambinder, MD PhD, contains the clinical trial of cell therapy of hematologic malignancies, entitled, "Prospective phase I Research of Expanded multi-antigen Specifically Oriented Lymphocytes for the treatment of Very high risk Hematopoietic Malignancies (RESOLVE)."   The RESOLVE trial began at CNMC with Kirsten Williams, MD as PI; she was replaced sometime around April, 2019 by Jeffrey Dome, MD.  JHU joined as a participating center on July 13, 2016 with Shannon McCurdy, MD as PI and with Drs. Jones and Cooke as co-investigators.  I was added as a co-investigator on May 10, 2017.   Dr. Cooke replaced Dr. McCurdy as PI on November 21, 2017.  Dr. Ambinder was added as an investigator only recently.
>
> The RESOLVE trial, also known as J1650 at JHU, tests the safety and anti-tumor efficacy of an infusion of white blood cells that are stimulated in tissue culture to increase the number of tumor antigen-associated lymphocytes, or TAA-L, cells of the immune system that are capable of killing cancer cells.  The cells are taken either from the patient or from a healthy donor, are expanded, and then are infused into the patient.  Federal regulations require investigators to file an Investigational New Drug (IND) application to the US Food and Drug Administration (FDA) for clinical trials of therapeutic cells that are "more than minimally manipulated." Catherine Bollard sponsored the IND application and was responsible for filing annual reports of outcomes to the FDA.  She also has filed patent applications on methods of expanding cells *ex vivo* for use in cancer therapy and has co-founded a

-33-

company, MANA Therapeutics, to commercialize expanded cell therapy of leukemia.

The RESOLVE trial enrolled patients onto one of three arms. Arm A enrolled patients who had undergone allogeneic blood or marrow transplantation and whose blood cancers had relapsed after transplantation or were at high risk of relapse. The primary objective of Arm A was "to determine the safety of administering rapidly-generated multiantigen-specific T lymphocytes, to hematopoietic stem cell transplant recipients." A secondary objective was "to determine the number of patients who respond to tumor associated antigen lymphocytes (TAA-T) for the treatment for relapsed/refractory hematopoietic malignancies as defined by those who maintain or achieve CR [complete remission], PR [partial remission], MR [mixed response], or SD [stable disease] following cell infusion and evaluate if this was associated with in vivo persistence of TAA-T." Section 4.2.1 of the protocol document, the most recent version of which is attached as Appendix A, establishes the criteria for evaluating disease response of treated patients:

> Patients will be assessed for response to TAA-T as a secondary endpoint on this study. This will be done using tests that revealed disease previously and are recommended for evaluation of the tumors tested (e.g. bone marrow aspirate and biopsy for leukemia, imaging with PET/CT for HD [Hodgkin disease]). Patients will be evaluated with appropriate modalities for all prior sites of disease and also for any new sites of disease based on symptoms. Response will be defined as any patient who does not progress on this study, including patients with active disease who achieve Complete Remission (including continued Complete Remission), Partial Remission, Mixed response, or Stable Disease.

The section goes on to define complete remission (same as complete response):

> Complete response (including continue Complete Response) is defined as complete remission (Cr) MRD (Minimal residual disease) positive or negative.
> o Leukemia and myelodysplastic syndrome: Cr MRD negative: No evidence of disease in any site including by minimal residual disease evaluations and cytogenetic studies. Cr MRD positive: Attainment of M1 bone marrow (with < 5% blasts) and no evidence of circulating blasts or extramedullary disease.

The protocol document defined partial response as

> Decreased evidence of disease (in all sites) without meeting criteria for CR (mrd negative).
> o Leukemia: Decreased enumeration of blasts (more than 10% change), which may include improvement from partial

-34-

remission (including MRD positive) to complete remission (MRD negative)

Fourteen patients were enrolled onto Arm A and received infusions of cells from their donors between May 21, 2015 and November 16, 2017. The first eleven patients received their infusions at CNMC, and two of the next three patients received their cell infusions at JHU. The original Program Project grant application, attached as "Original P01 application," states

> Eleven (6 from Hopkins) enrolled BMT recipients (age range 9-70 years; 10 allogeneic and 1 autologous) for Hodgkin's lymphoma (n=2), B cell ALL ([acute lymphocytic leukemia]; n=3), or AML/MDS ([acute myeloid leukemia/myelodysplastic syndrome]; n=6) received TAA-L for relapsed disease 2-12 months after BMT.

Later, it states "Responses of evaluable patients (n=9) were: progressive disease (n=2) stable disease (n=2), CR (n=4) and PR (n=1) with only one patient receiving adjunct therapy after TAA-L."

The original grant application received an overall impact score of 21, with 10 being the highest possible score and 90 the lowest possible score, and was not funded. The reviews of the original application are attached as "Original P01 review." Project 3 received an impact score of 2.3, with 1 the highest and 9 the lowest. The first reviewer of the project commented, "Despite numerous clinical trials in the field, no sufficient data have been generated to show the sustained benefit of infusion of the tumor-antigen directed T cells or the degree of T cell avidity." Later, the same reviewer noted, "Incremental building of a project that has been going on for a while." The third reviewer noted, "Preliminary data in relapsed patients looks promising."

Dr. Jones resubmitted the program project grant application on June 5, 2018 with the same projects and cores. The revised application is attached as "Revised P01 application." The introduction to each project allows the project leaders to provide a response to the comments of the reviewers. The introduction to project 3 includes the following comments and responses:

> 1. _No sufficient data have been generated to show the sustained benefit of infusion of the tumor-antigen directed T cells ....and how will this change the field? W_e have treated a total of 14 patients with relapsed hematologic cancers post BMT and seen durable complete responses in 8 patients (7 with AML). While follow-up continues, 2 patients maintained their CR for >1 year . . . .Hence, we assert that this additional preliminary data demonstrating tumor cell clearance, durable clinical responses and TAA-T cell persistence is sufficient to show sustained benefit of TAA-T cell administration in vivo for the prevention and treatment of patients with HR AML post BMT.

-35-

>   2.  *Incremental building of a project that has been going on for a while.*
>       **TAA-T induced CR in 87.5% relapsed patients** post BMT which is
>       unprecedented for any cell therapeutic in AML. (emphasis in original)

In the project description, the applicants go on to state,

>   14 patients (8 patients from JHU) (age range 9-70 years; for Hodgkin's
>   lymphoma (n=2), B cell ALL (n=2), or AML/MDS (n=8) received TAA-L
>   for relapsed disease 2-12 months after BMT. . . . .Responses of evaluable
>   patients (n=12) are: progressive disease (n=2), stable disease (n=2), CR
>   (n=8) and PR (n=1) with **7/8 AML patients achieving CR/PR.** (emphasis
>   in original)

The revised grant application received an impact score of 17 and the NCI funded
the grant.  The reviews are attached as "Revised P01 review."  While the score for
Project 2 declined from 3.0 to 3.3 and the score for Project 4 stayed the same at 1.7,
the score for Project 1 improved from 3.3 to 2.7 and the score for Project 3 improved
from 2.3 to 1.7.  In all likelihood, the improvement of the score for Project 3
contributed to the success of the grant application.  The first reviewer of the revised
project application noted "Preliminary data are intriguing and suggest that the
approach proposed is safe and feasible to the problem of relapse in patients
undergoing allogeneic stem cell transplant for AML/MDS."  However, this
reviewer also noted some inconsistencies, for example, "It is stated that there are
12 evaluable patients, but then the numbers for PD, SD, CR, and PR add up to 13."
The second reviewer noted "The preliminary data suggesting the practicality of
producing TAA-T cells and their effectiveness (7/8 AML patients responded) are
the major strength of the study."

The patient outcomes reported in the revised grant application raise suspicions of
research misconduct because they are incompatible with the patient outcomes
reported in the IND annual report of 2019, the grant progress report submitted in
2020, and patient outcomes documented in the electronic medical records. I have
provided the following documents in the appendix:

1.  A draft of the IND annual report of 2019 found on a shared network drive
    (Appendix B)
2.  A summary of patient outcomes from the IND report (Appendix C)
3.  The Project 3 annual progress report, sent to me by Catherine Bollard
    (Appendix D)
4.  Redacted records of the fourth (P88) and sixth patient (P102) infused on
    trial (Appendix E).

P88 and P102 had AML that relapsed after allogeneic transplantation.  Their
leukemias progressed within 45 days after TAA-L infusion on the RESOLVE trial,
meeting criteria for progressive disease.  Both patients received their cell infusions
at CNMC but received their care from Dr. Jones at Johns Hopkins.  P88 received

his infusion on February 25, 2016 but was noted to have progressive leukemia on a bone marrow biopsy performed at an outside hospital on April 1, 2016. Dr. Jones saw the patient on May 12, 2016, noted the relapse, and proposed palliative care options. P102 received his lymphocyte infusion on August 2, 2016 but was noted to have progressive AML by flow cytometric analysis of a bone marrow specimen taken on September 23, 2016. He was seen by Dr. Jones's nurse practitioner, Audra Shedeck, on September 29, 2016. Her note mentions "Dr. Jones discussed at length with patient and wife about relapse and there being no further treatment options." Dr. Jones should have known when he submitted the grant on June 5, 2018 that the claim of 7/8 AML patients achieving CR/PR could not have been true. At best he was acting in reckless disregard of the truth when he submitted that claim as part of the grant.

The claim that "**TAA-T induced CR in 87.5% relapsed patients** post BMT" creates the impression that seven patients had detectable disease just prior to cell infusion and achieved complete remission following the infusion. The reaction of the second reviewer, who stated that the major strength of the study was the effectiveness of the TAA-L, supports this impression: "7/8 AML patients responded." Additional patient data contradict this claim. The two AML patients who received their infusions at Johns Hopkins, JHU003 and JHU005 in Appendix C, were both in complete remission at the time of their lymphocyte infusion. While JHU005 remains in remission, the AML in JHU003 relapsed 4 months after her infusion. In neither case is it possible to claim that TAA-T induced CR. Looking at the first eight AML patients in Appendix C, three (P66, P88, and P102) had progressive disease after the infusion and one (P195) had a partial response with a decline in blasts from 0.01% to 0.005%. The remaining four (P91, P124, P150, and P184) were in remission at the time of infusion and remained in remission for 6 months, 17 months, >3 years, and 4 months, respectively. It is fair to say that none of these patients went from having AML detectable by flow cytometry just before infusion to having no AML by flow cytometry at the first measurement after infusion.

On June 9, I e-mailed Catherine Bollard, Kenneth Cooke, and Rick Jones to inquire about the disparities between the outcomes reported in the revised grant application and the outcomes of the two patients treated at Johns Hopkins before the grant was submitted. I inquired,

> How many of the AML patients treated on the RESOLVE trial before June, 2018 were not in remission at the time of ex vivo-expanded cell infusion, and what were their outcomes? Did any patient with AML detected by flow cytometry just before infusion convert to negative for AML by flow cytometry after cell infusion in the absence of additional therapy? If so, how many?

Catherine Bollard replied,

Ephraim, you are correct and on auditing this outcome data has been extensively revised since patients achieved a CR with bridging therapy and then got T cells and then achieved a continued complete response. I will forward the outcome table that we submitted for the progress report. Rick can give you more context since he helped me with the audit.

Rick Jones then replied,

As Cath mentioned, there were some issues with the response assessments on the phase I portion of this study. These were by the PI of the study at National Children's who was not affiliated with the P01 and is no longer involved in the trial (the phase 2 portion that is part of the P0). These issues were actually picked up by Cath, and verified by me who was asked by National Children's to review data as an external auditor. I don't believe this issue affected the conduct of the study, since it was phase I dose-finding and toxicity arm, and response was not endpoint, and National Children's agreed. I am pretty sure Cath and Rich updated the true responses that she and I vetted (with National Children's) in the P01's annual progress report.

These replies suggest that Kirsten Williams provided incorrect data to Dr. Bollard, who uncritically reported the incorrect outcomes in the revised BMT Program Project application. Published abstracts reporting patient outcomes from the study suggest repeated inaccuracies. On February 22, 2017, the investigators presented an abstract of data from the RESOLVE trial at the annual meeting of the American Society for Blood and Marrow Transplantation. Kirsten Williams was the first author, Richard Jones was the penultimate author, and Catherine Bollard was the last, or senior, author. This and other subsequent published abstracts are included in Appendix F. They claimed that "Eight enrolled HCT [hematopoietic cell transplant] recipients (age range 23-70 years) with Hodgkin's disease (n = 1), B cell ALL (n = 2), or AML (n = 5) with relapsed disease 2-12 months after HCT received TAA-L." Later in the abstract, they claimed that "Responses of evaluable patients (n = 7) were: progressive disease (n = 2), mixed response (n = 1), stable disease (n = 1), CR (n = 2) and PR (n = 1) with only one patient receiving adjunct therapy after TAA-L." The IND annual report filed in 2019 confirms that the fifth AML patient received his infusion on September 16, 2016.

Sometime between May 3-6, 2017, the investigators presented results of the RESOLVE trial at the annual meeting of the International Society for Cell & Gene Therapy. There, they claimed that "Ten HCT recipients (range age 9–70 years) with relapsed Hodgkin's disease (n = 2), B cell ALL (n = 3), or AML (n = 5) received 1–3 doses of TAA-L." Later, they claimed that

Responses of evaluable patients (n = 9) were: progressive disease (n = 2), mixed response (n = 1), stable disease (n = 2), CR (n = 4). Of the CR patients: AML (n = 3) and only 1 received adjunct vidaza after TAA-L; one

-38-

with Ph+-ALL achieved BCR-ABL negativity post TAA-L for the first time post-HSCT without adjunct therapy.

The summary of the IND annual report confirms these diagnoses and shows that the tenth patient, who had Philadelphia chromosome-positive ALL, received her infusion on November 9, 2016. The IND annual report states that, "Patient achieved **continued complete hematologic remission** but now with an **MRD negative disease state** on 12/27/16 (6 weeks after TAA-T infusion #1). Patient was continued on dasatinib." (emphasis in original) Based upon this report, I assume that the investigators submitted or revised the ISCT abstract on or after 12/27/16.

By December 27, 2016, each of the five AML patients had been observed for more than three months after *ex vivo*-expanded cell infusion, and therefore all were evaluable for response. Three of these five AML patients achieved complete remission according to the ISCT abstract. Yet in the revised BMT P01 application submitted in June, 2018 the investigators claimed that "**TAA-T induced CR in 87.5% relapsed patients** post BMT which is unprecedented for any cell therapeutic for AML." It is not possible that TAA-L induced complete remission in three of five AML patients as reported in the ISCT abstract of May, 2017 and then seven of eight patients in the revised grant application of June, 2018. Dr. Bollard should have known that the claims of patient outcomes contained in the grant application were incompatible with those reported in published abstracts authored by her.

I pointed out the discrepancies between the outcomes presented in published abstracts and those reported in the grant application in an e-mail to Drs. Bollard, Cooke, and Jones in an e-mail on June 12. Dr. Jones replied

> These issues were actually picked up by Cath and me when the PI sent us a draft of the paper, and the paper was not submitted. I was asked by Children's to be an external auditor of study, and they thoroughly investigated the issues. The response data in the phase I part were corrected in Cath and Rich's annual Progress Report to the NCI. Children's National determined that the issues did not affect the conduct of the current Phase II study, since the response assessments in question were on phase I dose-finding and toxicity arm, response was not the primary endpoint, and there was no dose-limiting toxicity.

It is somewhat odd that CNMC would ask Dr. Jones to audit the trial and that he would agree since he is an investigator on the trial and treated at least two of the patients in question. Regardless, it appears that Drs. Bollard and Jones made false claims of the anti-tumor efficacy of lymphocyte infusions given on the RESOLVE trial. They failed to notify the NCI that the claims were incorrect immediately after CNMC conducted their audit of outcomes. They waited until the annual progress report was due, and even then failed to notify the NIH that the claims of efficacy in

the revised grant application were incorrect. Instead, they provided a table of outcomes that contradicted the claims in the grant application, without calling attention to the discrepancies. The failure to include a statement that the outcomes table contradicted the grant application is significant because, to the best of my knowledge, annual progress reports are reviewed by NIH administrators, not by the grant reviewers, so the contradiction can easily go unnoticed.

### DEFENDANTS' FALSE STATEMENTS AND OMISSIONS WERE MATERIAL

63.    As a result of Defendants' knowingly material false statements and omissions, NCI approved the Grant and committed to provide total funding of approximately $11,156,287 over five years for it. JHU/Children's have presented false claims for payment of the first four annual budget periods in amounts of $2,269,507 for FY2019, $2,221,695 per year for FY2020 and FY2021, and an estimated $2,221,695 for FY2022,  totaling false claim payments to date of approximately $8,934,592.

64.    Information publicly available at https://report.nih.gov/success_rates/index.aspx indicates that in FY2019, the year that it appears NCI approved the Grant, NCI received 64 new P01 applications and only approved 11 of them for funding.

65.    As described above, the initial application received a lower grade and did not get approved for funding. The false statements and omissions in the Resubmission caused a significant improvement in Project 3's grade. Based on his knowledge of the NCI review process, and his knowledge of the underlying science, Dr. Fuchs believes and alleges that had the scientists reviewing and grading the Grant Resubmission known the truth about the RESOLVE trial's design and lack of therapeutic efficacy, they would have graded Project 3 lower.

66.    Based on his knowledge of the NCI review process, and his knowledge of the underlying science, Dr. Fuchs believes and alleges that had the scientists reviewing and grading

the Grant Resubmission known the truth about the Prostate Cancer Study's lack of efficacy and

the incidence of graft-versus-host disease, they would have graded Project 4 lower.

67.     Based on his knowledge of the NCI review process, and his knowledge of the

underlying science, Dr. Fuchs believes and alleges that had the scientists reviewing and grading

the Grant Resubmission known the truth about either Project 3 or Project 4, NCI would have denied

funding to Defendants' Resubmission, and would have funded competing P01 grants that were

more meritorious.

68.     Defendants' false statements and omissions described above were also material

because the United States vigorously investigates and takes enforcement action against research

misconduct in federal grants. As just a few examples:

> In announcing a $112.5 million False Claims Act settlement with Duke University,
> Assistant Attorney General Jody Hunt for the Department of Justice's Civil Division said,
> "The resources utilized by NIH and EPA to fund important research and clinical programs
> across the nation are limited. Today's settlement demonstrates that the Department of
> Justice will pursue grantees that knowingly falsify research and undermine the integrity of
> federal funding decisions."

> The NIH website has the following "overview" on "Research Misconduct": "NIH has
> specific procedures in place to handle allegations of research misconduct. All allegations
> of research misconduct received at the NIH are promptly and carefully reviewed. However,
> NIH does not have the authority to conduct investigations of these allegations except for
> the ones involving NIH intramural research. Ultimately, all research misconduct
> allegations involving NIH awards are forwarded to the HHS Office of Research Integrity
> (ORI) for their oversight."

> NIH's Office of Research Integrity investigates and makes findings of research misconduct
> by individuals involved in NIH grants. *See* case summaries at
> https://ori.hhs.gov/content/case_summary.

### JHU IGNORED DR. FUCHS' PREVIOUS DISCLOSURE OF RESEARCH FRAUD

69.     In 2007, Dr. Fuchs reported his suspicions to JHU that JHU falsely represented

mortality rates for years in a study of a vaccine for pancreatic cancer, including in a Specialized

Program of Research Excellence (SPORE) grant application that was funded by the NCI. Dr. Fuchs

has confirmed that the SPORE grant authors repeatedly falsified mortality results in the study to NIH/NCI, academics, and the investing public. JHU took no action.

70.     Through counsel, Dr. Fuchs summarized his suspicions of research fraud in a November 6, 2007 letter to Edward D. Miller, Dean of the Medical Faculty, and other JHU officials. Dr. Fuchs has attached that letter as Exhibit 2 to this Complaint and incorporates it into this Complaint.

71.     Through counsel, Dr. Fuchs made more specific and detailed allegations that JHU covered up research misconduct related to the pancreatic cancer vaccine study, quoted below. In order to make this Complaint less bulky, Dr. Fuchs has not attached to this Complaint the documents referenced as attachments that he provided to JHU's Integrity Officer, though he can make those documents available to the Court upon request:

> **From:** Christopher Mead <cmead@schertlerlaw.com>
> **Sent:** Monday, June 29, 2020 3:40 PM
> **To:** jgottlie@jhmi.edu; smach1@jhu.edu; bbittne2@jhmi.edu
> **Subject:** RE: Dr. Ephraim Fuchs
>
> Dear Ms. Gregory, Mr. Bittner, and Ms. Gottlieb:
>
> As Ms. Gottlieb is aware, Dr. Fuchs made a report of research misconduct in 2007 related to "A safety and efficacy trial of lethally irradiated allogeneic pancreatic tumor cells transfected with the GM-CSF gene in combination with adjuvant chemoradiotherapy for the treatment of adenocarcinoma of the pancreas." I summarized the bases for Dr. Fuchs's suspicions of research misconduct in two letters sent to JHU on November 6 and 7, 2007. I have attached those letters to this email. In sum, Dr. Fuchs analyzed various abstracts and presentations by the authors of that study, and demonstrated that it was highly likely that the authors' repeated reports of an initial 76% two-year survival rate for study patients was not true. Dr. Fuchs also showed that the authors reported out of date results at a January, 2007 ASCO meeting to generate press releases allowing a publicly traded company to tout the study treatment as "encouraging." That publicly traded company continued to make milestone payments to JHU as part of a license agreement for patents on the study technology. Three professors in the JHU oncology department, including one of the study authors, collectively received 35% of those milestone payments.

In violation of JHU policy and a written promise from Dr. Dang [the Associate Dean for Research at the time], JHU revealed Dr. Fuchs's identity and his allegations to the study authors. Dr. Dang reported that the authors were "hurt" by the allegations.

On September 26, 2008, Dr. Fuchs and I met with JHU officials to discuss JHU's so-called "investigation" of Dr. Fuchs's suspicions. I wrote an email the next day to Dr. Dang, Dr. Nelson, Ms. McLean, Ms. Garrity, and Ms. Gottlieb, summarizing the meeting and the apparent deficiencies in JHU's "investigation." The study authors allegedly based their claims of a 76% two-year survival on results for the first 36 study patients. At the September 26, 2008 meeting, it was apparent that JHU had not investigated what percentage of the first 36 patients had survived for two years. I specifically requested in writing that JHU determine how many of the first 36 patients survived for two years.

I have pasted my September 27, 2008 email below:

> Dear Dr. Dang, Dr. Nelson, Ms. McLean, Ms. Garrity, and Ms. Gottlieb:
>
> Dr. Ephraim Fuchs and I thank you for the time you spent with us yesterday and for the work you have done in responding to Dr. Fuchs' suspicions of research misconduct. This letter will confirm that at the meeting, you told us that the investigators assert that the abstract presented at the November, 2005 AACR/NCI/EORTC meeting reporting a 76% two-year survival rate for the study at a time when 36 patients were evaluable for two-year survival is correct. You also told us that the inquiry committee did not find any misconduct in reporting that same two-year survival percentage in additional abstracts and oral presentations as late as April, 2007, by which time every patient enrolled in the study was more than two years post-surgery. You also told us that the investigators told you that the 14 tick marks on the right side of the median line on the survival curve for slide 10 of the June, 2007 ASCO presentation did not represent actual patients, but "events" in some K-M analysis. You also told us that the inquiry committee determined that a criterion that eliminated patients who suffered prompt progression of disease after surgery satisfied an "intent to treat" criterion for a properly designed cancer vaccine study, but that the inquiry committee had not analyzed whether it was appropriate for the investigators to compare survival rates for a vaccine study where more than 25% of the sickest patients had been excluded to overall survival rates for the disease.
>
> I asked at the meeting whether anyone had analyzed the window of time when 36 patients (but not 35 or 37) were evaluable for two-year survival, looked at the dates of death (if they had succumbed to this terrible disease) and dates of surgery for each of those 36 patients, and determined what percentage of those patients were still alive two years after surgery. It appeared from your responses that no one had done that analysis. This letter will confirm that I expressed skepticism that the reported 76% two year

survival rate was accurate, and that I asked JHU to conduct that analysis and report the results back to us.

Please let us know at your earliest convenience whether JHU is willing to analyze (1) the actual two-year survival, from the date of surgery, of the first 36 vaccinated patients who were evaluable for two year survival; and (2) the actuarial two-year survival of all 60 vaccinated patients at the time when 36 of them were evaluable for two-year survival, and report the results to us as a significant step in allaying Dr. Fuchs' concerns. We believe that analyzing this data is necessary to address the concerns Dr. Fuchs expressed, and that doing so would not constitute an "investigation" under JHU procedures.

I received no response to my email. Almost three full months later, I received the attached December 18, 2008 letter from Patricia L. McLean, JHU Senior Associate General Counsel. Ms. McLean wrote that "The School of Medicine has conducted a thorough inquiry into allegations you and Dr. Fuchs have raised and has concluded that the allegations do not warrant further investigation."

At the time JHU concluded its "thorough inquiry," it was still receiving federal grant money for the pancreatic vaccine study. The grant applications repeated the false claims of a 76% two-year survival. To our knowledge, JHU never informed the government that it had reported false data from the study.

As part of a study he conducted on accumulated data from numerous JHU oncology trials, Dr. Fuchs obtained access to the patient records from the pancreatic vaccine study. He was able to determine two-year survival for 58 of the 60 patients in the study. Those death dates confirmed that the two-year survival rate for the first 36 patients was no higher than 55%.

In addition to its desire to avoid disclosure that it had submitted false data to the federal government, its desire to continue receiving Federal grant support, and its desire to continue receiving milestone payments, JHU had another reason to avoid public disclosure that its pancreatic vaccine study had reported false data. JHU was cultivating donations eventually totaling $85 million from the family of a pancreatic cancer patient treated at JHU with the same vaccine. The study authors finally published data for all 60 patients in 2011 that reported an approximate 53% two-year survival rate, without admitting years of false reports claiming a 76% two-year survival rate.

. . .

We request that JHU investigate how a "thorough inquiry" into Dr. Fuchs' allegations about the pancreatic vaccine trial could have failed to reveal the inaccurate data, and how JHU failed to correct false data presented in federal grant applications. . . . . .

### COUNT I (False Claims Act)
### (Against Both Defendants)
### (Knowingly Presenting or Causing to be Presented False and Fraudulent Claims)

72.     Dr. Fuchs realleges the preceding paragraphs and incorporates them into this Count.

73.     Defendants JHU and Children's knowingly, with actual knowledge, deliberate ignorance, and reckless indifference, submitted materially false or fraudulent claims for payment, and caused materially false or fraudulent claims for payment to be submitted, to officials of the United States government, in violation of 31 U.S.C. 3729(a)(1)(A). Each claim for funding under the Grant was a false claim for payment, based on material false information and failures to disclose as alleged in this Complaint.

74.      Because of Defendants' conduct set forth above, the United States has suffered actual damages in an amount to be determined at trial. The United States made payments to JHU pursuant to the approved Grant which it would not have made had it known the truth about the Resubmission.

75.     The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

### COUNT II (False Claims Act)
### (Against Both Defendants)
### (Knowingly Making and Using False Records and Statements)

76.     Dr. Fuchs realleges the preceding paragraphs and incorporates them into this Count.

77.     Defendants knowingly, with actual knowledge, deliberate ignorance, and reckless indifference, made, used, and caused to be made and used, false records and statements material to false and fraudulent claims, including but not limited to the Resubmission and progress reports under the Grant, in violation of 31 U.S.C. 3729(a)(1)(B).

78.     Because of Defendants' conduct set forth above, the United States has suffered actual damages in an amount to be determined at trial. The United States made payments to JHU pursuant to the approved Grant which it would not have made had it known the truth about the Resubmission and other false and misleading documents created by Defendants.

79.     The United States is entitled to treble damages plus a civil penalty for each violation of the False Claims Act.

### COUNT III (False Claims Act)
### (Against Defendant JHU)
### (Concealing Obligations)

80.     Dr. Fuchs realleges the preceding paragraphs and incorporates them into this Count.

81.     As described above, as a result of Dr. Fuchs' email exchanges with the Grant investigators, and Dr. Fuchs' report of research misconduct to JHU's Research Integrity Officer in June 2020, Defendant JHU became increasingly aware of the material false claims, false statements, and material omissions in the Grant Resubmission.

82.     Despite this knowledge, JHU has not provided Dr. Fuchs with any substantive response to his report of research misconduct.

83.     Upon information and belief, JHU has concealed its knowledge of the material false statements and omissions in the Grant Resubmission, and has kept the funding it received under the Grant in 2019 and 2020, totaling approximately $4,600,804.86.

84.     By concealing its knowledge of these falsities JHU knowingly concealed and improperly avoided obligations to pay or transmit funds to the Government, namely the funding it has received under the Grant to date, in violation of 31 U.S.C. 3729(a)(1)(G).

85.     As a result of JHU's knowing concealment and improper avoidance, the United States suffered actual damages in an amount to be determined at trial.

86.     The United States is entitled to treble damages plus a civil penalty for each violation off the False Claim Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ephraim Fuchs, M.D., acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against Defendant on each count of the Complaint as follows:

1.  For treble the amount of the United States' damages, plus civil penalties of $11,000 for each false claim;

2.  For all costs of this civil action; and

3.  For prejudgment interest and for such other and further relief as the Court deems just and equitable.

MOREOVER, Plaintiff/Relator Ephraim Fuchs, M.D., on his own behalf, demands and prays that an award be made in Relator's favor as follows: for 25 percent (25%) of the proceeds collected by the United States if the United States intervenes in and conducts this action, or for 30 percent (30%) of the proceeds if the United States does not intervene; for an amount for reasonable expenses necessarily incurred by Relator in the prosecution of this action; for all reasonable attorney's fees and costs incurred by Relator; and such other and further relief to which the Relator may be justly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff/Relator demands that this case be tried before a jury.

Respectfully submitted,


s/Christopher B. Mead
_____
Christopher B. Mead
Schertler Onorato Mead & Sears
555 13th Street, N.W. 500 West
Washington, DC 20004
T: (202) 628-4199
F: (202) 628-4177
cmead@Schertlerlaw.com

Counsel for Relator