UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *ex rel.*
EPHRAIM FUCHS,

    *Plaintiff*,

v.

JOHNS HOPKINS UNIVERSITY *et al.*,

    *Defendants.*

No. 20-cv-3242 (DLF)

**MEMORANDUM OPINION**

Relator Ephraim Fuchs brings this *qui tam* action against defendants Johns Hopkins University ("JHU") and Children's National Medical Center under the False Claims Act, *see* 31 U.S.C. § 3729 *et seq.* Fuchs alleges that the defendants defrauded the federal government by submitting a grant application with material falsities to obtain funding from the National Institutes of Health ("NIH") for bone marrow transplant research. Before the Court are the defendants' motions to dismiss. Dkts. 43, 44. For the reasons that follow, the Court will grant the motions.

I.    **BACKGROUND**

    A.    **Statutory Background**

The False Claims Act ("FCA") "impose[s] liability for fraud against the government." *United States v. Honeywell Int'l Inc.*, 47 F.4th 805, 810 (D.C. Cir. 2022) (internal quotation marks omitted). The Act's presentment clause, 31 U.S.C. § 3729(a)(1)(A), bars knowingly submitting false or fraudulent claims to the United States for payment, *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 195–96 (D.D.C. 2011). The Act's false statement clause, 31 U.S.C. § 3729(a)(1)(B), bars knowingly making or using false records or statements to support a

false claim. The latter clause is "complementary" to the former and is "designed to prevent those who make false records or statements . . . from escaping liability solely on the ground that they did not themselves present a claim for payment." *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004).

The FCA is "enforced through a unique public-private scheme" that permits private parties—relators—to bring *qui tam* actions on behalf of the federal government against defendants who submit false claims or make or use materially false records. *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 424–25 (2023); *see* 31 U.S.C. § 3730(b)(1). The FCA "effects a partial assignment of the Government's own damages claim." *Polansky,* 599 U.S. at 425 (cleaned up). If an action under the FCA is successful, a relator may receive up to 30 percent of the total recovery, depending on the nature of the relator's contribution. *See* 31 U.S.C. § 3730 (d)(1)–(2).

Because the government remains the "real party in interest" in a *qui tam* action, a relator is subject to certain procedural restrictions beyond those imposed on other civil litigants. *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 930 (2009). To commence an FCA action, a relator must file his complaint under seal to provide the government an opportunity to investigate the claims and determine whether to intervene. *See* 31 U.S.C. § 3730(b)(2); *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 415 (D.C. Cir. 2021). The government must notify the Court if it decides not to intervene, and only then may the relator proceed with the action on his own. *See* 31 U.S.C. § 3730(b)(4), (c)(3).

B.  **Factual Background**[1]

---

[1] In evaluating a motion to dismiss, the Court considers "any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). The Court will evaluate the

NIH solicits applications for research grants known as "Program Project Grants," which fund "integrated, multiproject research programs involving a number of independent investigators who share knowledge and common resources." Am. Compl. ¶ 6, Dkt. 15. Each Program Project Grant application proposes multiple projects, often run by independent investigators, related to a central research objective. *Id.* NIH convenes panels of subject-matter experts to evaluate grant applications under a two-tier review process. First, three members of the NIH panel evaluate each individual project on a 9-point rating scale (where 1 is exceptional and 9 is poor) considering factors such as scientific and technical merit and potential impact. *Id.* ¶ 8. The entire panel assigns the grant application an overall impact score ranging from best possible score of 10 to a worst possible score of 90. *Id.* Second, applications recommended by the panel are reviewed by the appropriate national Advisory Council or Board. *See* NIH, Funding Opportunity Announcement No. PAR-18-290 (Oct. 27, 2017), https://grants.nih.gov/grants/guide/pa-files/par-18-290.html.

This case concerns a May 2017 grant application submitted by JHU and Children's National to obtain NIH funding for bone marrow transplant research. Am. Compl. ¶ 7; *see* Submission, Dkt. 40-1. The application proposed four projects, two of which—Project 3 and Project 4—lie at the heart of this dispute. On initial submission, Project 3 received a score of 2.3 (out of a best possible score 1), Project 4 received a score of 1.7, and the overall application received a score of 21 (out of a best possible score of 10). Am. Compl. ¶ 9; Submission Rev. at 2–3, Dkt 40-2. The application was not approved. Am. Compl. ¶ 9. In June 2018, the defendants resubmitted a 1,107-page application (the "Resubmission") proposing the same four projects. *Id.*

---

grant submissions that Fuchs has incorporated into his complaint. *See* Submission, Dkt. 40-1; Resubmission, Dkt. 40-3. It also takes judicial notice of publicly available information about the NIH grant application process. *See Masek v. United States*, No. 22-cv-03574 (RC), 2024 WL 1240093, at *7 (D.D.C. Mar. 22, 2024).

3

¶ 10; *see* Resubmission, Dkt. 40-3.  In April 2019, the Resubmission was approved—Project 3 received an improved score of 1.7, Project 4 received the same score of 1.7, and the overall application received an improved score of 17.  *See* Resubmission Rev. at 1–2, Dkt. 40-4.  NIH committed to providing approximately $11 million over five years to fund 16 clinical trials proposed under the grant.  Am. Compl. ¶ 63; *see generally* Resubmission.

Relator Fuchs is a professor of oncology and immunology at the JHU School of Medicine.  Am. Compl. ¶ 3.  Fuchs served as a co-leader for Project 4, an investigator for Project 3, and a contributor to the grant application.  *See* Resubmission at 168, 640.  Six months after NIH funded the grant, Fuchs suggested changes to one of the clinical trials approved as part of Project 4.  Am. Compl. ¶¶ 25, 47.  Other investigators expressed concerns that Fuchs's proposal raised potential conflicts of interest arising from his connections to a for-profit business.  *See* Resubmission at 80–81; Am. Compl. ¶ 25, at 15.  Fuchs's proposed changes were adopted in part, but Fuchs was removed as an investigator from the trial.  Am. Compl. ¶¶ 49–52.  In June 2020, Fuchs wrote a letter to JHU's Research Integrity Office detailing concerns about the Resubmission.  *Id.* ¶ 11.

### C. The Resubmission

Fuchs's letter and his current action allege that the Resubmission contained material falsities related to trials in Project 3 and Project 4.  The Court will describe the proposals and alleged falsities in turn.

#### 1. Project 3, "RESOLVE" Trial – Arm A

The RESOLVE Trial in Project 3 involved therapies for patients suffering from high-risk forms of leukemia.  Am. Compl. ¶ 57.  Investigators hypothesized that after leukemia patients received bone marrow transplants, infusions of T lymphocyte cells (white blood cells) taken from the marrow donor could trigger an immune response or prevent relapse in leukemia patients.  *Id.*

Under Arm A of the RESOLVE Trial, investigators proposed to test the safety of increasing doses of T cell infusions in post-transplant patients who were already suffering leukemia relapse. *Id.* ¶ 59. The "primary objective of Arm A was 'to determine the *safety* of administering [T cell therapy]'" to relapsed patients. *Id.* ¶ 62, at 34 (emphasis added). The secondary objective was to assess patient "response"—that is, the therapy's efficacy. *Id.* The study categorized efficacy of patient response as "Complete Remission," "Partial Remission," "Mixed response," or "Stable Disease." *Id.* Upon review of the initial grant application, one reviewer noted that "no sufficient data have been generated to show the sustained benefit of [T cell therapy]" and that Arm A was only "[i]ncremental building of a project that has been going on for a while." Am. Compl. ¶ 62, at 35–36.

Fuchs alleges that the Resubmission contained false efficacy data about patient responses to Arm A. The Resubmission asserted that "preliminary data" in an ongoing study indicated that T cell therapy had induced remission in 87.5% of relapsed patients, which was "unprecedented for any cell therapeutic" for post-transplant leukemia patients. Resubmission at 599 ("TAA-T induced CR in 87.5% relapsed patients post BMT"); Am. Compl. ¶ 62, at 36. The project description later asserted that seven out of eight—or 87.5 % of—patients in the ongoing trial had achieved complete or partial remission. *See* Resubmission at 604 ("Responses of evaluable patients (n=12) are: progressive disease (n=2), stable disease (n=2), CR (n=8) and PR (n=1) with *7/8 AML patients achieving CR/PR*."); *see* Am. Compl. ¶ 62, at 36. According to Fuchs, that 87.5% number contradicted a paper presented by RESOLVE investigators at a May 2017 conference of the International Society of Cell & Gene Therapy. Am. Compl. ¶ 62, at 39. The number also contradicted the data in the 2020 progress report submitted to NIH. *Id.* ¶ 62, at 36. The May 2017 paper reflected that only three out of five (or 60% of) relevant patients had achieved remission.

5

*Id.* ¶ 62, at 39.  In June 2020, Fuchs emailed Jones and other investigators about the inconsistency. *Id.*  Jones replied that the issue had been identified by auditors and corrected in the 2020 progress report submitted to NIH.  *Id.*  An corrected table of patient outcomes was included in the 2020 progress report.  *Id.*

### 2. Project 3, "RESOLVE" Trial – Arm C

Under Arm C of the RESOLVE Trial, investigators proposed injecting post-transplant leukemia patients with donor T cells within 44 days of transplant, to determine whether the therapy would prevent or delay relapse.  Am. Compl. ¶ 57.  Relapse risk is heightened in the period immediately following transplant, and Arm C proposed to study the therapy's effects beginning in this elevated risk period.  Fuchs alleges that investigators failed to comply with the proposed trial design and manipulated the sample of enrolled patients by enrolling post-transplant patients who had already gone several months without experiencing negative health events.  *Id.* ¶ 58.  According to Fuchs, enrolling this "highly selected, favorable [patient] cohort" resulted in "clinically meaningless" data, and NIH likely would have downgraded the project had they known Arm C "would produce only this meaningless comparison."  *Id.*

### 3. Project 4, Trial 2 (the "Nivolumab Trial")

Trials 1 and 2 of Project 4 were interrelated and involved the use of bone marrow transplants to treat certain high-risk solid tumors.  *Id.* ¶ 26.  If patients enrolled in Trial 1 had a positive reaction to transplant and met certain conditions, they would become eligible to enroll in Trial 2.  *See id.*  Trial 2 patients would receive bi-weekly doses of Nivolumab, an expensive antibody treatment manufactured by Bristol-Myers Squibb.  *Id.*  The initial grant application proposed only Trial 2 and requested funding.  *Id.* ¶ 27.  Just before the Resubmission in June 2018, JHU entered into a sponsored research agreement with Bristol-Myers Squibb, under which the

6

company would provide the necessary quantities of Nivolumab for free and subsidize other trial costs. *Id.* ¶¶ 28–29. But after patient enrollment in Trial 2 fell below expectations, around November 2019, Bristol-Myers Squibb informed JHU it would no longer provide Nivolumab or subsidize new enrollees. *Id.* ¶ 35. In the 2020 grant progress report, investigators did not disclose that Bristol-Myers Squibb had withdrawn financial support. *Id.* ¶ 37.

### 4.     Project 4, Trial 3 (the "Prostate Cancer Trial")

Trial 3 (the "Prostate Cancer Trial") was co-led by Richard Jones, the principal investigator of the overall grant. *Id.* ¶ 13. The trial proposed to use bone marrow from female donors to treat male patients with metastatic prostate cancer. *Id.* ¶ 15. Following transplant, patients would receive testosterone injections, under the hypothesis that testosterone would trigger an immune response from the donated female marrow cells directed toward metastatic prostate cancer cells. *Id*. Efficacy would be evaluated by measuring any decrease in the patient's prostate-specific antigen, a protein associated with prostate cancer progression. *Id.*

The Prostate Cancer Trial was proposed in the initial grant application and NIH reviewers highlighted some potential concerns. *Id.* ¶ 17. As a general matter, bone marrow transplants carry serious risks of graft-versus-host-disease, a potentially fatal condition caused by donor cells attacking a patient's normal issues. *Id.* ¶ 14. A reviewer noted that "development of [graft-versus-host-disease] and [transplant-related mortality] may remain major hurdles" to the Prostate Cancer Trial therapy. *Id.* ¶ 21. A reviewer also noted that the proposed therapy could backfire: if the therapy "d[id] not adequately induce endogenous T cell [immune] responses in a timely fashion, the cancers may progress rather than regress." *Id.* ¶ 17. By the time of the Resubmission, investigators had tried the proposed therapy on three patients. *Id.* ¶ 18. The Resubmission asserted that 2 of those patients had shown a "dramatic" response: "3 patients have been enrolled (*first 2*

*with dramatic decreases in [prostate-specific antigen]*, 1 just starting)." Resubmission at 749 (emphasis added). In response to initial reviewers' concerns about cancer progression, the Resubmission again noted that "the *first 2 patients showed dramatic responses to [the therapy]*, but we will continue to carefully monitor [cancer progression] in our first-in-human study." *Id.* (emphasis added).

Fuchs alleges that the assertions about a "dramatic" response contradicted underlying patient records, and he further challenges the Resubmission's failure to disclose that both patients suffered graft-versus-host-disease. Am. Compl. ¶ 25, at 13. Fuchs points to an email sent around March 2020, from a Prostate Cancer Trial investigator, expressing pessimism about patient enrollment and noting that "none of the first three patients had anything that looked like a significant response to the transplant." *Id.* In an email to Jones, Fuchs challenged the trial results and asserted that neither patient had met the "protocol-defined criterion" for response based on prostate-specific antigen measurements. *Id.* ¶ 25, at 16. Jones disagreed: he responded that "the first patient absolutely had a response, no question," *id.* ¶ 25, at 14, and that the patient "told [Jones] a month or so before he died, he was sure he had only survived 3 years because of the transplant," *id.* ¶ 25, at 17. Jones further stated that the second patient was "doing well and in fact showing a response." *Id.* He sent accompanying data showing that the second patient's prostate-specific antigen measurements dropped from 276.4 in December 2017 to 158.8 in April 2018. *Id.* ¶ 25, at 18.

\*   \*   \*

After JHU failed to act on his letter, Fuchs filed suit on November 6, 2020. Dkt. 1. He asserts claims under the FCA's presentment clause (Count I), false statement clause (Count II), and reverse false claims clause (Count III). Am. Compl. ¶¶ 72–86. The United States declined to

intervene. *See* Dkt. 21. The defendants move to dismiss. JHU Mot. to Dismiss, Dkt. 43; Children's Hosp. Mot. to Dismiss, Dkt. 44.

## II. LEGAL STANDARDS

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A facially plausible claim "allows [a] court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id*. at 679, and the Court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation marks omitted). But the Court need not accept "a legal conclusion couched as a factual allegation" nor an inference unsupported by the facts alleged in the pleadings. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Fraud claims brought under the FCA must also satisfy Rule 9(b)'s heightened pleading standard, which requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Totten*, 286 F.3d at 551–552. A plaintiff must "state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1287 (D.C. Cir. 1994) (internal quotation marks omitted).

## III. ANALYSIS

9

A.      **Presentment and False Statement Claims**

To allege a presentment or false statement claim under the FCA, a plaintiff must show that (1) the defendant submitted a claim or made a statement to the government; (2) the claim or statement was false; and (3) the defendant knew the claim or statement was false. *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014) (Jackson, J.).  Courts have also read a materiality standard into the falsity element. *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 98–99 (D.D.C. 2017).  In other words, a presentment or false statement claim under the FCA requires proof of falsity, materiality, and scienter.

The first element, falsity, requires an "objective falsehood," and "imprecise statements," "differences in interpretation," or "subjective" statements do not qualify. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376–77 (4th Cir. 2008) (citing *Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999)).  A defendant's omission also can amount to a false statement, but that omission must be "misleading." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 186–87 (2016).  The Act "does not impose liability for omissions unless the defendant has an obligation to disclose the omitted information." *United States ex rel. Milam v. Regents of Univ. of California*, 912 F. Supp. 868, 883 (D. Md. 1995).  The second element, materiality, inquires whether the falsity would have "a natural tendency to influence, or be capable of influencing," the "behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 182–83 (internal quotation marks omitted).  Materiality is a "rigorous" and "demanding" standard because the FCA is not "an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches." *Id.* at 192.  Materiality "is not 'too fact intensive' for courts to resolve on a motion to dismiss." *United States ex rel. Gardner v. Vanda Pharm., Inc.*, No. 17-cv-00464 (APM), 2020 WL 2542121, at *8 (D.D.C. May 19, 2020) (quoting

*Escobar*, 579 U.S. at 195 n.6). Third, the element of scienter requires the defendant to have "actual knowledge" of the falsity, or "deliberate ignorance or reckless disregard" for the truth. *United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 298 (D.C. Cir. 1994) (internal quotation marks omitted).

The FCA also permits a plaintiff to proceed under a fraudulent inducement theory. *See Pencheng Si*, 71 F. Supp. 3d at 87–88; *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005). Under that theory, a plaintiff must show that the defendant's contract with the government was procured by fraud, and that the government "never would have entered the contract, and no payments would have been made," had the fraudulent inducement been known. *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 69 n.33 (D.D.C. 2007).

1. **Project 3, "RESOLVE" Trial – Arm A**

Fuchs challenges allegedly fraudulent data about the efficacy of Arm A of the RESOLVE Trial. The Resubmission asserted that 7 out of 8 (or 87.5% of) patients had experienced complete remission after T cell therapy. Resubmission at 599, 604 (T cell therapy had "induced [complete remission] in 87.5% relapsed patients," and "7/8 . . . patients achieve[d] [complete remission or partial remission]."). According to Fuchs, those statements were fraudulent because the 87.5% number contradicted data in a later 2020 grant progress report and in a separate paper presented at a scientific conference in 2017, and because the Resubmission did not disclose that patients in *continuing* remission were included in the "Complete Remission" category.[2] Am. Compl. ¶¶ 59,

---

[2] Fuchs raises new allegations in his opposition brief about the proportion of grant funding allocated to the RESOLVE Trial. Opp'n at 33–34, Dkt. 57 (estimating that Project 3 would consume 28.6% of overall grant funding). But in evaluating a motion to dismiss, the Court cannot consider factual allegations raised for the first time in an opposition brief. *Pappas v. District of Columbia*, 513 F. Supp. 3d 64, 81 n.5 (D.D.C. 2021) ("[A plaintiff] cannot amend his or her complaint by the briefs in opposition to a motion to dismiss.") (citation and internal quotation marks omitted).

62, at 36–37. Even accepting that the preliminary patient data was false—which the Court assumes without deciding—Fuchs fails to plausibly allege that it was material to NIH's funding decision.

Comments on the Resubmission show that fully-informed NIH reviewers did not view the preliminary data as material, nor did they heavily rely on efficacy projections in approving the grant. One reviewer noted that "[i]t is not expected that durable remissions will be achieved in 80% of [treated] patients," reflecting an understanding that the 87.5% remission rate was not expected to be maintained. Resubmission Rev. at 32. Another reviewer described the challenged data as "not clear and hard to interpret," and pointed out an arithmetic error in the patient numbers in the Resubmission. *Id.* ("Responses of evaluable patients (n=12) are: progressive disease (n=2), stable disease (n=2), CR (n=8) and PR (n=1) with 7/8 AML patients achieving CR/PR. It is stated that there are 12 evaluable patients, but then the numbers for PD, SD, CR, and PR add up to 13."). Despite expressing skepticism about the accuracy and predictive value of the efficacy data, the reviewers nonetheless awarded a high grade to Project 3 and approved the overall grant. The reviewers' notes also show that the agency understood safety determinations to be the central contribution of Arm A, and efficacy to be a secondary concern. *See* Am. Compl. ¶ 62 ("The primary objective of Arm A was to determine the safety of administering [T cell therapy to] . . . transplant recipients."); Resubmission at 600, 675 (under "NIH principles," trials categorized as Phase I (like Arm A) are "physiologic, toxicity, and dose-finding studies," in contrast to Phase II efficacy trials). That evaluating efficacy was the "secondary" objective of Arm A further suggests that the preliminary efficacy data was immaterial. *Escobar*, 579 U.S. at 194 ("Materiality . . . cannot be found where noncompliance is minor or insubstantial.").

That NIH continued funding after the 2020 grant progress report provided corrected patient response data is strong evidence that the data inconsistencies were not material to the agency. *See*

12

*Escobar*, 579 U.S. at 195 ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."). Although Project 3's grade improved from 2.3 to 1.7 following the Resubmission, taken as a whole, even in the light most favorable to the relator, the complaint and incorporated documents fail to raise a plausible inference that the efficacy data was material to the overall grant, which included four discrete projects consisting of 16 ongoing and anticipated clinical trials. Am. Compl. ¶ 7.

To the extent that Fuchs relies on the defendants' *omission* of any corrective statement about that data, that claim would also fail for the same lack of materiality. *See United States ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1, 8 (D.D.C. 2015) (a relator must plead that "omitted information was material").

Accordingly, the presentment and false statement claims with respect to Arm A of the RESOLVE Trial will be dismissed without prejudice.

### 2. Project 3, "RESOLVE" Trial – Arm C

Next, the Court turns to the alleged falsities about Arm C of the RESOLVE Trial. Fuchs alleges that the Resubmission represented that enrolled patients would receive T cell infusions within 44 days of bone marrow transplant, when in reality, some enrolled patients did not receive infusions until months later. Am. Compl. ¶¶ 57–58. He further alleges that alterations to the Arm C design rendered the resultant data "clinically meaningless." *Id*. ¶ 58.

But the record reveals that the Resubmission contained minor discrepancies about the Arm C trial design: it asserted at various points that patients would receive T cell infusions within 30 days, 44 days, or 60 days of transplant. *See* Resubmission at 607 ("TAA-L will be given post-BMT, prior to relapse, at day *30 ± 14 days*" (emphasis added)); 621 (study timeline for RESOLVE

13

Cohort C aims to "[t]reat 26 patients with high risk AML/MDS with TAA-T cells within *60 days post BMT*" (emphasis added)); 625 ("TAA-L will be given posttransplant, prior to relapse, on *day 30*." (emphasis added)).  While the Resubmission was pending, investigators submitted an amended protocol to the JHU institutional review board, extending the timeframe for infusions to within five months of transplant.  *See* Opp'n at 22.  Thus, the Arm C timeline, as implemented, varied from the Resubmission's proposed timeline by roughly three to four months, and the extension was not disclosed in the Resubmission or 2020 grant progress report.  *Id.*

Fuchs has not plausibly alleged that the undisclosed protocol modifications rose to the level of fraud.  *See Pencheng Si*, 71 F. Supp. 3d at 86–87.  As a matter of law, "[d]isagreements over scientific methodology do not give rise to False Claims Act liability." *Milam*, 912 F. Supp. at 886 (citing *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815–16 (9th Cir. 1995)). Fuchs does not allege that the investigators manipulated the study data or falsely reported the study's results.  He instead alleges that a modification to a clinical protocol affected the *scientific significance* of study results.  Am. Compl. ¶ 58 (alleging that the 3-month discrepancy ultimately went to the "clinical[]" significance of the study).  But the "legal process is not suited to resolving scientific disputes," and the FCA "is concerned with ferreting out 'wrongdoing,' not scientific errors." *Milam*, 912 F. Supp. at 886 (quoting *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992)).  Disputes about study methodology—even if they render statements "scientifically untrue"—are not "lie[s]" under the FCA.  *Id.*; *see also United States ex rel. Jones v. Brigham and Women's Hosp.*, 678 F.3d 72, 87 (1st Cir. 2012) ("[T]he decision as to which measurement method to employ was a question of scientific judgment.").  Accordingly, the Court concludes that the modifications to the Arm C study design could not amount to falsities under the FCA, and it will dismiss without prejudice the claims based on Arm C.

3.     **Project 4 — Nivolumab Trial**

Next, Fuchs claims that the defendants' failure to disclose Bristol Myers Squibb's withdrawal of funding from the Nivolumab Trial in Project 4 amounted to a material omission from the 2020 grant progress report. Am. Compl. ¶ 37. This claim also fails because Fuchs has failed to allege that the investigators had any obligation to disclose that withdrawal of funding under the terms of the grant or under any other NIH policy. *See Milam*, 912 F. Supp. at 883 (to sustain a fraud claim based on an omission, a relator must allege that "the defendant has an obligation to disclose the omitted information").[3]

4.     **Project 4 — Prostate Cancer Trial**

Fuchs further contends that the Resubmission was materially false because (1) it characterized the first two patients's responses to the Prostate Cancer Trial therapy as "dramatic," Resubmission at 749, and (2) it failed to disclose that both patients suffered graft-versus-host-disease. In support, Fuchs relies on data from patient records.

As alleged in the complaint, the first patient's prostate-specific antigen measurements dropped, following a May 2017 transplant, from 8.4 to 7.7 (or rough 9%) before rising. Am Compl. ¶ 25, at 11. The second patient's measurements dropped, following a December 2017 transplant, from 276.4 to 158.8 in April 2018 (or roughly 43%) before rising. *Id.* ¶ 25, at 19. According to Fuchs, neither decrease was fairly characterized as "dramatic" because neither

---

[3] In the alternative, even if the defendants did have an obligation to disclose the withdrawal of the Bristol Myers Squibb funding, Fuchs fails to allege that the funding was material to the approval of the grant. According to Fuchs, materiality can be inferred because the initial, unapproved submission did not include the funding, while the approved Resubmission did. Am. Compl. ¶¶ 27, 33. But Project 4's unchanged grade in the Resubmission vitiates that inference: on initial submission, Project 4 received the same score of 1.7 as it did for the Resubmission. This entirely consistent scoring suggests that the funding had no impact on NIH's assessment of Project 4. Fuchs provides no other basis for his "information and belief" that the funding was material. *Id.* ¶ 33.

15

patient had met the "protocol-defined criterion" of a 50% drop in prostate-specific antigen. Am. Compl. ¶ 25, at 16.  Both patients suffered from graft-versus-host disease, and both ultimately died.  *Id.* ¶ 25, at 17.

The principal investigator on the trial, Jones, disagreed that neither patient responded to the treatment.  Jones asserted that the first patient initially "had a response, no question and that the patient attributed his 3-year survival to the transplant and subsequent therapy." *Id.* ¶ 25, at 14. Jones also provided data showing the second patient's 43% decrease in prostate-specific antigen measurements.  *Id.* ¶ 25, at 19.  He further explained that graft-versus-host disease is an expected response following bone marrow transplant, and that the patient population eligible for enrollment in the study faced inherently high risks of mortality, given the nature of their prostate cancer.  *Id.* ¶ 24 ("If you take pre-dead patients, they are not going to be cured (short of divine intervention – imantinib doesn't cure blast crisis CML, CAR T cells cure end-stage ALL or lymphoma).").

Characterizing the first two patients' responses to the therapy as "dramatic" was not materially false because, as a general matter, "[e]xpressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false." *Jones*, 678 F.3d at 87.  The term "dramatic" is an imprecise adjective, and thhere may be a "wide difference of opinion of what is, and what is not" dramatic because the term is "not precise or measurable."  *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003).  The complaint highlights a reasoned disagreement between two scientists about how to describe the data and holistic patient responses.  Am Compl. ¶ 25, at 14–17.  While Fuchs asserts that "dramatic" was inappropriate to describe a measurement that did not meet a certain protocol definition, *id.* ¶ 25, at 16, the relevant statements in the Resubmission never claimed to meet that definition or any other specific numerical cutoff.  In these circumstances, the Court is reluctant to

16

attribute falsity to an adjective expressing a subjective scientific judgment on which reasonable minds may differ. *Jones*, 678 F.3d at 87.

But even if the use of the term "dramatic" was improper in this context, it does not rise to a material falsity. The initial grant application did not use the term or include the patient results, and yet Project 4 still received a score of 1.7 (out of a best possible score of 1). *See* Submission at 567; Submission Rev. at 2. The Resubmission included both the term and the results, and the project received the same score. *See* Resubmission at 749; Resubmission Rev. at 3. Project 4's unchanged score undermines any inference that the "dramatic" statements were material, particularly to the NIH reviewers' decision to fund the overall grant, which included three additional projects.

Similarly, the defendants' failures to mention the patients' graft-versus-host disease were not omissions rising to material falsities. As Fuchs himself alleges, bone marrow transplants are broadly understood to present a "substantial risk" of fatal graft-versus-host disease. Am. Compl. ¶ 14. And NIH expert reviewers' comments reflected that they understood the high likelihood that enrolled patients would suffer from the disease. *Id.* ¶ 21 ("[D]evelopment of GVHD and TRM [transplant-related mortality] may remain major hurdles for this approach" and "[d]evelopment of GVHD and risk of TRM are a concern."). Given the wide-spread scientific consensus, it cannot be said that the defendants' failure to mention an expected side-effect of transplant was "misleading" for expert reviewers. *Escobar*, 579 U.S. at 181.

Accordingly, the Court will dismiss the claims based on the Prostate Cancer Trial without prejudice.

**B.     Reverse False Claims**

A reverse false claim action "involves a defendant knowingly making a false statement in order to avoid having to pay the government when payment is otherwise due." *Pencheng Si*, 71 F. Supp. 3d at 88 (citing *United States v. Caremark, Inc.*, 634 F.3d 808, 814–815 (5th Cir. 2011)); *see* 31 U.S.C. 3729(a)(1)(G).  Fuchs alleges that the defendants improperly avoided payments to the government by not refunding the money obtained under the allegedly fraudulent NIH grant. Am. Compl. ¶¶ 83–84.  But this kind of avoidance does not state a reverse false claim as a matter of law.  *See United States v. Newman*, No. 16-cv-01169 (CKK), 2017 WL 3575848, at *9 (D.D.C. Aug. 17, 2017) ("[T]he allegation that Defendants fraudulently concealed their original false claim . . . and thereby prevented the government from discovering that fraud is not by itself enough to establish an 'obligation' to return the credit for the purposes of a reverse false claim action."). Because Fuchs relies on the same conduct to support his presentment and false statement claims, he does not assert an actionable avoidance under the reverse false claims clause.  *See Pencheng Si*, 71 F. Supp. 3d at 97.  Accordingly, Count III will be dismissed with prejudice.

## CONCLUSION

For the above stated reasons, the defendants' motions to dismiss are granted.  A separate order accompanies this memorandum opinion.

*[signature: Dabney L. Friedrich]*

DABNEY L. FRIEDRICH
United States District Judge

March 31, 2025